[Crim. No. 6824. In Bank. Apr. 20, 1961.]

THE PEOPLE, Respondent, v. DOUGLAS ANDERSON
et al., Appellants.

Russell E. Parsons, Harry E. Weiss, and Daniel N. Busby for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendants, Douglas Anderson and Fred Padilla, were charged in count 1 with grand theft and in count 2 with attempted grand theft. At their trial by jury evidence as to count 1 showed that defendants set a larcenous scheme in motion in Los Angeles and consummated it in Las Vegas; evidence as to count 2 showed that they began to carry out a similar scheme in Los Angeles but did not complete the theft because the victim was suspicious and notified the authorities. The jury found defendants guilty as charged.

Their motions for new trial were denied. Defendants appeal from the ensuing judgments of conviction but not from the orders denying their motions for new trial. They contend that the information fails to allege public offenses with sufficient particularity to give them notice and opportunity to prepare their defense, and that the evidence as to each count shows that the acts of defendants in California amounted at most to mere preparation for crime, not to criminal attempts. We have concluded that these contentions are without merit and that the judgments should be affirmed.

*Sufficiency of the Accusatory Pleading.* The information, essential allegations of which are quoted in the footnote,[1] is in a form which is permitted by, and has been in common use since, the enactment of the following legislation in 1927: Stats. 1927, ch. 619, amended Penal Code, sections 484 through 490, and added section 490a so that the crimes formerly known as larceny (including larceny by trick or device), embezzlement and obtaining property by false pretenses are now all known as theft. Stats. 1927, ch. 612, amended section 952 to provide that "In charging theft it shall be sufficient to allege that the defendant unlawfully took the . . . property of another." (Other amendments simplifying the rules of pleading are Stats. 1927, ch. 610, amending section 959, Stats. 1927, ch. 611, amending sections 954 and 956, and Stats. 1927, ch. 613, amending section 951.)

Because of the quoted amendment of section 952, "it was not necessary for the information to allege the particular type of theft involved, such as false pretenses, embezzlement, or larceny by trick and device." (*People* v. *Nor Woods* (1951), 37 Cal.2d 584, 586 [2] [233 P.2d 897].) "Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate . . . ; defendant is entitled to such

---

[1]Count 1 alleges that defendants "are accused . . . of the crime of GRAND THEFT in violation of Section 487, Subdivision 1, Penal Code of California, a felony, committed as follows: That [defendants] . . . on or about the 6th day of December, 1958, at and in the County of Los Angeles, . . . did willfully, unlawfully and feloniously take Forty Nine Hundred and 00/100 Dollars ($4900), in money, lawful money of the United States, the personal property of John P. Lane."

Count 2 alleges that defendants "are accused . . . of the crime of ATTEMPTED GRAND THEFT in violation of Section 487, Subd. 1 P.C. and Sec. 664 P.C., a felony, committed as follows: That [defendants] . . . on or about 27th day of January, 1959, at and in the County of Los Angeles, . . . did willfully, unlawfully and feloniously attempt to take Four Thousand and 00/100 Dollars ($4000), in money, lawful money of the United States, the personal property of A. B. Valenzuela."

transcript under section 870 . . . of the Penal Code.'' (*People* v. *Roberts* (1953), 40 Cal.2d 483, 486 [3] [254 P.2d 501].)

*Prosecution Evidence as to Count 1.* John P. Lane from time to time had placed bets on horses with defendant Padilla for more than a year prior to December 1958. On December 5 Padilla introduced Lane to defendant Douglas Anderson. Anderson wore a wig and heavy mustache and was introduced as ''Dan McKinny.'' Padilla said that ''McKinny'' was a professional gambler from Las Vegas with a roulette system by which, according to Lane's testimony, he could ''double or triple my money in the course of a few hours. . . . [I]t would be impossible to lose, and even if things did go wrong, they knew the dealers and they knew the pit boss and everything else, and they were sure that it was a sure thing.'' Defendants explained that they were ''marked men in Las Vegas, and they needed a reputable business man to front the deal for them''; that although ''McKinny'' on several occasions had won as much as $60,000 by his system, defendants were currently in need of a ''bank roll'' of $4,000 or $5,000. Lane believed in and relied on defendants' representations until the hereinafter described occasion in Las Vegas when he decided he had been ''taken.'' He agreed to supply the bank roll in return for 50 per cent of the winnings. It was further agreed that Padilla would receive one half of ''McKinny's'' share of the winnings.

''McKinny'' made a reservation for Lane at a Las Vegas hotel. Lane withdrew $4,000 from his bank account and took it to Las Vegas. There ''McKinny'' said that ''it would take $5,000 to swing the deal'' and Lane cashed a check for $1,000. ''McKinny'' repeated his representations ''about this sure proof system.'' A man whom ''McKinny'' introduced as ''Bob Cox'' told Lane that ''McKinny . . . knew all the pit bosses and everything else, and he was a professional gambler, and how he was taking different casinos and never did an honest day's work in his life. . . . And he said, 'It's a sure cinch that you can't lose any money at this system.' ''

''Cox'' then left and ''McKinny'' and Lane went to a casino. ''McKinny'' said, ''The fellows I know, they are not around the casino right now. . . . Why don't you try your luck at the crap table?'' Lane cashed a $100 bill into $5 chips and proceeded to play dice. ''McKinny'' said, ''We'd better cash that money in $100 chips so we will be ready to play roulette. . . . Why don't you go ahead and continue playing . . . and I will run over and get the $100 chips . . . at the

cashier's window." Lane asked, "Well, can't I get the chips here?" "McKinny" replied, "No, they won't give you $100 chips at the table."

Lane handed "McKinny" $4,900 and "McKinny" disappeared. Lane continued to play dice for 15 minutes, then "I more or less knew that I was taken." He reported the matter to the security officer of the casino and the sheriff's department of Las Vegas, and after an unsuccessful search for "McKinny" he returned to Los Angeles.

On December 8, 1958, in Los Angeles, Lane got in touch with Padilla and told him, "[I]t was a fine way you set me up." Padilla said, "What do you mean, Johnny?" Lane replied, "It was a con game all the way and you had a part in it." Padilla said, "Honest, Johnny, I didn't have nothing to do with it," and agreed to attempt to locate "McKinny." The next day Padilla told Lane, "I never believed Doug Anderson would do that." This is the first occasion on which Padilla in speaking to Lane referred to "McKinny" by his actual name. Lane said, "I thought you introduced me [*sic*] as Dan McKinny. . . . Why did you introduce him to me as Dan McKinny?" Padilla "put his hands up to his face and made no comment."

Thereafter Padilla told Lane "that he knew I was taken for the money, and that if . . . he couldn't get in touch with Doug Anderson to get the money back from him, he would raise the money himself and deliver it back to me."

On December 18, 1958, Padilla at his own suggestion executed a demand note for $4,900 to Lane. Thereafter Padilla repeatedly asked for more time in which to raise the money and Lane said that if it was not forthcoming he would report the matter to the Los Angeles district attorney, which he eventually did. On January 28, 1959, Lane saw defendant Anderson, without the wig and mustache, in a police lineup and identified him.

*Prosecution Evidence as to Count 2.* Adolph Valenzuela, a businessman in Los Angeles county, met Padilla in December 1958 or January 1959. About January 25, 1959, Padilla came to Valenzuela and "said that he had a deal in Las Vegas that would make money . . . ; we'd probably make ten, twelve thousand dollars in a night." Padilla arranged for Valenzuela to meet his "partner." The "partner," defendant Douglas Anderson, wearing a wig and mustache, was introduced to Valenzuela as "Bill." Defendants agreed to make a hotel reservation for Valenzuela in Las Vegas. Valenzuela

testified, "Bill said that he would lead, and then . . . when he told me the pitch was on, for me to go on and start gambling. . . . I was supposed to finance the deal, about four to five thousand dollars"; winnings were to be divided equally among "Bill," Padilla and Valenzuela, with Valenzuela's expenses "off the top."

Valenzuela became suspicious of defendants' representations and reported the matter to the office of the district attorney. On the night of January 27, 1959, when Padilla visited Valenzuela's residence to further discuss their arrangements, investigators and a tape recorder were concealed in an adjoining room.

Padilla asked if Valenzuela had the money. Valenzuela replied that he did and displayed a roll of bills which "was supposed to be $4,000, but it wasn't. . . . I had hundred dollar bills on the outside, with $1.00 bills on the inside."

The tape recording of their conversation includes the following: Padilla said that the Las Vegas reservation for Valenzuela had been made for the next day; that "Bill" was "real liked around Las Vegas" and "good in cards and dice"; that the game was "already fixed." Valenzuela asked, "[W]hat guarantee have I got?" Padilla replied that "Bill" would "maybe put up $1500 himself." Later during the conversation Valenzuela again asked about a "guarantee" and Padilla replied, "You're going to play the hand; you're going to win the money you put on it." Valenzuela asked, "What is Bill's last name? Where can I get ahold of him?" Padilla did not answer the first question but said, "He hangs around the El Rancho all the time." Padilla later said that "Bill" would meet Valenzuela when he arrived in Las Vegas and introduce the dealer, who would "explain you the whole thing."

When Padilla indicated his intention of leaving Valenzuela's residence, the investigators came from the next room and announced that he was under arrest. One of the investigators asked Padilla, "What's the situation in this matter and how did you get mixed up in it?" Padilla "hung his head for a moment, didn't answer," then, questioned again, he said, "I don't know how I got mixed up in it. I'm ashamed of it." The investigator said, "It's pretty obvious that this situation is a similar one to the John Lane case." Padilla replied, "I didn't get one dime of the money."

Police officers found defendant Anderson driving Padilla's car in the vicinity of Valenzuela's residence. Valenzuela said to Anderson, "Where in the hell is your mustache?" Ander-

son said, "Who are you? I don't even know you." Valenzuela replied, "The hell you don't. . . . [Y]ou're wearing the same shirt you had on last night." To this Anderson made no reply.

*Defense Evidence.* Defendants took the stand, contradicted much of the prosecution evidence, and gave assertedly innocent explanations as to some of their conduct. Their would-be exculpatory testimony was not believed by the jury and need not be recounted.

*Sufficiency of the Evidence to Show Attempted Grand Theft in California.* The case of *People* v. *Buffum* (1953), 40 Cal.2d 709, 716 [5, 6] [256 P.2d 317], holds that under Penal Code, section 27 (subd. 1)[2] and section 778a,[3] a crime committed in part in California can be punished here only if the acts committed in California amount to a criminal attempt, "a 'direct' ineffectual act towards consummation of the crime," and amounting to more than mere preparation.

 The "direct" acts necessary to constitute an attempt to obtain property by false pretenses can be simply the making of misrepresentations calculated to induce the victim to part with his property. (*People* v. *Camodeca* (1959), 52 Cal.2d 142, 145 [1-5a] [338 P.2d 903].) Here the offense undertaken by defendants in California (and, as to count 1, consummated in Nevada) was not the obtaining of property by false pretenses (where the victim intends to part with title to his property) but rather larceny by fraud, trick or device (where the victim intends to part with possession only). (*People* v. *Nor Woods* (1951), *supra,* 37 Cal.2d 584, 586 [4]; *People* v. *Delbos* (1905), 146 Cal. 734, 736 [81 P.2d 131].) The making of misrepresentations with the requisite specific intent on the part of defendants, however, can constitute an attempt to commit the type of theft here involved as well as the type shown in *Camodeca*.

 Here, as to count 1, the trier of fact could and presumably did determine that defendants in California, with the specific intent to consummate theft in Las Vegas, did every-

___

[2]Penal Code, section 27: "The following persons are liable to punishment under the laws of this state:

"1. All persons who commit, in whole or in part, any crime within this state. . . ."

[3]Penal Code, section 778a: "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state."

662

thing necessary to get their victim and his money to Las Vegas so that defendant Anderson could get his hands on the money by making the final misrepresentation that he was going to buy chips with it. As to count 2, the trier of fact could and presumably did find that defendants similarly did everything necessary to get their victim and his money to Las Vegas for a like larcenous purpose. The latter scheme, however, failed because of the victim's lack of perduring credulity and ensuing complaint to the district attorney. In our opinion the fact that the scheme in each case required a final step of fraud, trickery or device outside California to complete the continuingly planned reduction of the victim's money to the thief's actual possession did not make the essential acts (misrepresentations) of defendants in California any the less "direct" acts towards consummation of the projected theft.

 As to offenses commenced in California and consummated without the state we recognize that "the Legislature is not ordinarily concerned with regulating conduct in other jurisdictions." (*People* v. *Burt* (1955), 45 Cal.2d 311, 314 [1] [288 P.2d 503, 51 A.L.R.2d 948]; *People* v. *Buffum* (1953), *supra*, 40 Cal.2d 709, 716 [1].) But California has a legitimate interest in applying its penal sanctions to those who by misrepresentations in this state lure persons and their property from this state to another jurisdiction for the purpose of there appropriating the property. We approve and follow the holding of the District Court of Appeal in *People* v. *Chapman* (1921), 55 Cal.App. 192, 197 [203 P. 126], that "the legislature, in subdivision 1 of section 27 [*ante*, f.n. 2], has declared, in effect, that all persons who make in this state any false or fraudulent representations whereby money or property is obtained without the state are punishable just as though all the acts had taken place in this state."

For the reasons above stated the judgments are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.