[Crim. No. 19992. Second Dist., Div. Four. Mar. 29, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS EDWARD UTTER, Defendant and Appellant.

536

## COUNSEL

Herbert E. Selwyn, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Norman H. Sokolow, Deputy Attorneys General, Joseph P. Busch, Jr., District Attorney, and Stephen S. Trott, Deputy District Attorney, for Plaintiff and Respondent.

## OPINION

**JEFFERSON, Acting P. J.**—Thomas Edward Utter was charged with (count I) murder (Pen. Code, § 187), (count II) robbery (Pen. Code, § 211) and three counts (counts III, IV and V) of grand theft (Pen. Code, § 487, subd. 1). With respect to the charges of murder and robbery and one count of grand theft, it was alleged that the defendant was armed with a 9 mm. Browning pistol. The defendant's motion to suppress evidence (Pen. Code, § 1538.5) was denied. Defendant pleaded not guilty and was tried by a jury. His motion for acquittal (Pen. Code, § 1118.1) was granted as to one count (count III) of grand theft. He was found guilty of murder first degree, robbery first degree, and two counts of grand theft; the jury found that he was armed at the time of the murder and the robbery.

The jury became deadlocked as to the murder penalty and, pursuant to the prosecution's recommendation, the court ordered imposition of a life sentence. The defendant's motion for new trial and probation were denied, and defendant was sentenced to life imprisonment as to the murder count and for the term prescribed by law as to all other counts. Execution of the sentences as to counts II and III was ordered stayed until sentences

on counts I, IV and V had been served. Because the sentence is inconsistent with the court's order dismissing count III, the judgment will be herein corrected accordingly. Defendant appeals the judgment of conviction.

The record discloses that Norma Carty Wilson was at the time of the crime a married woman in her fifties, who owned and enjoyed substantial income from several investment properties, including apartment houses in Santa Monica, an office building on La Cienega Boulevard, and the Brentwood Convalescent Hospital on San Vicente Boulevard.

The relationship of Norma Wilson with the defendant was traced back at least as early as 1964 when Harry Scholer, who built the Brentwood Convalescent Hospital, sold it to Mrs. Wilson. Defendant was the salesman from the office of broker Frank Archer, who handled the transaction.

After the defendant became a broker he occupied space in Mrs. Wilson's office building on La Cienega. Early in 1968 Mrs. Wilson discussed with her accountant and tax consultant the advisability of disposing of the office building. She considered transferring it to the defendant in an exchange of properties rather than selling because of the tax advantages of real estate trades. The defendant, who for 14 years prior to these events had used the name Thomas Devins and will henceforth be so designated herein, had suggested the exchange of the office building property for another parcel on San Vicente which he proposed to develop with a medical facility since it was close to the Cedars-Sinai Hospital. He had planned that Mrs. Wilson should trade and become a participant in the development of the new property, receiving 50 percent of the ownership, while defendant and his real estate associate, Glen Gould, would share ownership of the balance. Mrs. Wilson's substantial financial statement was a requisite to obtaining financing for the development.

Norma Wilson later consulted Phillip Horrigan, her attorney, and indicated concern about this real estate exchange in which she had become involved. It was her understanding that defendant proposed to exchange her office building for some Malibu property which would then be exchanged for the San Vicente property. Her attorney became concerned because she had placed defendant in the position to transfer good title to her office building to a good faith purchaser. When contacted by Mr. Horrigan, the defendant stated that the trade for the Malibu property had been completed, but he was agreeable to meeting with the attorney and would willingly modify or inscribe the agreement in order to make the intentions of the parties clear. The meeting, originally scheduled for the week of March 25, never took place and was successively postponed by

defendant's failure to appear. Defendant later declared that the Malibu property had been exchanged for 61 acres of undeveloped land in San Bernardino County.

Meantime, in June of 1968, Norma Wilson received a summons relating to litigation which had been filed by Dr. Abraham, the lessee of the Brentwood Convalescent Hospital, demanding either specific performance or damages with respect to defendant's alleged sale of the hospital to him. The defendant was contacted and agreed to attend a meeting in the latter part of June, but he did not appear at this time or at a meeting scheduled for July 29 at the attorney's office. Despite defendant's continued failure to keep appointments and her attorney's advice that civil litigation be instituted against the defendant, Norma Wilson was reluctant to proceed in that manner. Not until September 1968 did attorney Horrigan have the opportunity to meet with the defendant and Norma Wilson. At that time the attorney advised defendant Devins that, as a holder of an expressly limited power of attorney, he had been unauthorized to enter into the transaction for the sale of the Brentwood Convalescent Hospital. The attorney suggested that the defendant refund the $5,000 deposit received from Dr. Abraham, and they terminate the litigation. The defendant agreed to cooperate in this respect and also agreed to send copies of the various deeds that had been used in the sequence of transfers from the La Cienega building to the Malibu property, thence to the San Bernardino acreage. However, he never sent either the documents or copies to the attorney.

Early in November 1968, Norma Wilson told her attorney that she believed they would finally be able to begin development of the San Vicente property, that defendant had told her he had funds arranged, but that he would need to go to Montreal in order to obtain the money. The defendant allegedly held an option on the San Vicente property (which was owned by Atlantic-Richfield), and a meeting had been scheduled in Montreal with Biafra refugees who had funds to invest. Her attorney was skeptical that funds would be forthcoming from Biafra. He wondered why the refugees couldn't come to the United States and suggested that his client was ill-advised to go on such a wild goose chase without documents, deeds or other indication that she or the defendant owned the property. On November 4, 1968, he once again attempted to dissuade her, saying she was wasting her time in dealing with a man who was obviously dishonest. The next day he again suggested that she at least postpone the trip until they could settle the matters relating to the California property. That was the last conversation he ever had with her.

Defendant's associate, Glen Gould, testified that after the defendant

received the deed to the La Cienega office building, he offered to trade that to Atlantic-Richfield for the property on San Vicente. When Atlantic-Richfield refused to trade he offered the building for sale and it was promptly purchased by Joseph Zukin, a building contractor. Mr. Zukin, of the Zukin Corporation, Lewis T. Busch who owned property in Malibu and George McMillen, an escrow officer at Security Bank, confirmed the acquisition of the office building property by Zukin Corporation in exchange for certain lots and cash.

Mr. Gould terminated his association with the defendant when he discovered this transaction, which defendant failed to explain, and when investigation disclosed no records evidencing defendant's title in the San Bernardino acreage which he claimed to own.

Dr. Samuel Abraham, an ophthalmologist, is the only stockholder in the Brentwood operating corporation, the lessee of the Brentwood Convalescent Hospital, which he claimed he purchased from the defendant in December 1968. The escrow took place at Security First National Bank, and as a part of the consideration Dr. Abraham gave the defendant two notes, one for $137,000 and one for $10,000. The $137,000 note and deed of trust was assigned to Sandra Lynn Bell, allegedly the defendant's sister, thence to "Okuma Aikba" who, on January 13, 1969, purportedly assigned it to "Thomas Devins." Dr. Abraham testified that he was later notified that a Mr. Stillman and Mr. Talais had acquired the $137,000 trust deed in 1969. The $10,000 note, which the defendant apparently demanded in lieu of a commission on the transaction, was transferred to a car company and ultimately repurchased at a discount by Dr. Abraham.

Dr. Abraham testified that at the time he executed the lease of the Brentwood Convalescent Hospital, he acquired from Norma Wilson, then owner, a long-term option to purchase the property for a price to be determined by its appraisal value at the time the option should be exercised and this agreement included a right of first refusal. The latter part of 1968, defendant represented that he had become the owner, showed the doctor a grant deed from Norma Wilson, and offered to sell him the hospital. Dr. Abraham did not at that time try to contact Norma Wilson for explanation; shortly thereafter Mr. Wilson visited the doctor to say that his wife was missing.

In another one of his ubiquitous real estate transactions, the defendant dealt with Lawrence Kates and his partner, David Rosen, of Standard Investment Company. Defendant said he had a house in Malibu which stood in his mother's name, "Mamie Elizabeth Utter," but his credit was insufficient to permit him to obtain a loan on the property. The property

was conveyed to Mr. Kates, who obtained the loan in his own name, and he and his partner became responsible for the repayment of the loan in the event of default. Defendant received $46,000 and it was agreed that if the house were not sold within a specified period, title would become absolute in Kates and Rosen, as ultimately it did. Defendant also conveyed to them, in the maiden name of David Rosen's wife, several lots in Malibu, agreeing that in consideration for protecting the property from attachment the partners should receive title to one lot. However, the property was reconveyed to defendant on demand on or about November 24, 1968. At that time, he told the partners that Norma Wilson was missing and her husband was accusing him of foul play. He said she had left him in Switzerland and he believed she might have gone to Hawaii because she liked the Orient and she was not getting along with her husband.

In these and numerous other fraudulent real estate transactions, Mrs. Rochelle Cohen, a notary public in the employ of Standard Investment Company, notarized signatures of persons who did not appear before her, at the direction of one or the other of her employers. One document was a power of attorney by Okuma Aikba to Thomas Devins, an assignment of a deed of trust from Sandra Lynn Bell to Okuma Aikba, a grant deed from Louise Glantz to defendant, and a signature of Marjorie Adelle Devins.

James Meares, an architect, acquired some undeveloped property in Malibu from Lewis Busch by deed bearing the legend "Mail Tax Statement to James Meares, c/o Thomas Devins." It was his understanding that he and defendant would develop the property and that he would receive the lot as compensation for his architectural work. Only at the preliminary hearing in this case did Mr. Meares discover he did not own the property. It was in his name for only 10 days before a recorded grant deed purportedly transferred the lot from him to "Mamie Elizabeth Utter"; he did not remember signing such a document.

As further evidence of these transactions, Jack Plaia of the Charter Bank of London, Los Angeles Branch, testified that an account was opened in the name of Thomas Devins, in trust for Okuma Aikba, with a trust deed note in the amount of $137,000 and a document which represented the defendant as the "attorney in fact" for Okuma Aikba. On December 17, 1968, deposits in the amounts of $10,000 and $49,646.06 respectively, were made to this account. On March 10, 1969, however, the balance was only $106.17. Another account had been opened by a Mr. Forget, on the same date, with a deposit of $5,000; on December 23 a second deposit was made of $2,500 and a deposit of $2,500 on December 27,

the same year. The $137,000 note was subsequently removed from the Charter Bank of London when they complained that no collections had been made on it and it was later placed with Crocker Citizens Bank as collateral for some loans to Mr. Stillman and Mr. Talis to whom the note had been assigned. Mr. Talis said he paid defendant $75,000 for the $137,000 note.

With respect to Norma Wilson's disappearance, employees of financial institutions testified her last transactions took place prior to November 1968. She last visited her dentist on October 13, 1968, and her medical doctor the latter part of August 1968. Several friends testified that Mrs. Wilson had spoken to them in early November 1968, indicating that she was taking a trip to Montreal and that she would be gone only a few days. The last time Mr. Wilson saw his wife was as she walked out to board the Air Canada flight to Montreal on November 8, 1968, at Los Angeles International Airport. The last word he received from her thereafter was a postcard dated November 14, 1968, from Tangiers. The airline insurance policy issued November 9, 1968, and signed by Mrs. Wilson stated "destination Madrid." It was subsequently learned that Norma Wilson's airline ticket was from Los Angeles to Montreal to New York, to Madrid to Lisbon and was paid all the way through. There were two other similar tickets for this itinerary, one for Robert Forget and the other for defendant.

Norma Wilson had a distant relative by marriage named Margaret Corcoran living in Madrid, Spain. Her husband Laurence, a furniture manufacturer, testified that in November 1968, Mrs. Wilson visited their store and home. She was dressed flamboyantly in a bright blue suit and a long, pale mink coat. She indicated that she was going south to complete a business transaction and to obtain a considerable amount of cash. She seemed to be jubilant at the prospect of completing this transaction.

When Mrs. Wilson did not return to Los Angeles by the latter part of November 1968, her husband became concerned and contacted the defendant. The defendant indicated that he had returned around November 27th or 28th. He said that Norma Wilson received a large quantity of cash, and that when he left her in Geneva she said she was going to visit a health spa in Sweden. In response to further questions with respect to the real estate transactions in which he had been involved with Mrs. Wilson, the defendant replied merely that these matters were confidential. Mr. Wilson asked defendant to attend a meeting of family and friends at the Wilson residence to assist them to theorize what might have happened to his wife but defendant did not appear. All private efforts made to locate Mrs. Wilson thereafter were futile.

The testimony of greatest significance was given by Robert Forget who had been a friend of the defendant's since about 1959. They had met when the defendant opened his independent real estate office in Mrs. Wilson's building on North La Cienega. Forget was a carpenter who finished off and connected the leased offices; the defendant became the building manager. Shortly before November 1968, Robert Forget moved back to Sedro Woolley, Washington, with his "girl friend," Colleen Davis. Thereafter he received correspondence from the defendant inquiring whether he was still interested in participating in a plan to liberate Moise Tshombe for a substantial cash incentive estimated in millions. The defendant sought Mr. Forget because he knew him, could trust him, and his native language was French. Mr. Forget said he would need $1,000 and the defendant agreed to send it immediately. He told Mr. Forget to bring his .38 automatic and shoulder holster. They met at Los Angeles International Airport and then for the first time the defendant mentioned that Mrs. Wilson would meet with them in Montreal to complete a real estate transaction. He cautioned Forget not to mention the Tshombe affair to her.

The three people travelled from Montreal directly to New York and left for Madrid the same day. It was in a hotel in Madrid that the defendant first told Robert Forget about "killing Mrs. Wilson," suggesting that Forget should do it. When Forget asked why that was necessary the defendant responded that Norma Wilson's accountant had discovered that he had been "screwing her on paper" and went to her attorney. He admitted he had done some strange things with the paper work and he was afraid she might pursue him legally. Forget tried to dissuade the defendant from his plan, telling him it was not a good idea, not easy to get rid of a body, and that he was taking a chance. He thereafter pretended to go along with the defendant who appeared to become nervous and fearful that Forget would skip out and tell someone. In fact, Robert Forget testified that he was afraid he might be the one to be shot. Appellant had a 9 mm. Browning. Subsequently, Mr. Forget left his .38 automatic under his pillow and it was confiscated by the Spanish authorities, but the 9 mm. Browning was not discovered.

They left Spain for Tangiers and there the defendant told Mrs. Wilson that the financial backers for the real estate transaction were coming down the Mediterranean in a yacht which they could meet in Casablanca. En route to Casablanca by automobile, however, they encountered a storm and had to return to Tangiers. Thereupon, Forget devised a tale that he had talked to Colleen in Washington, learned she was sick and he had to return to the United States. Defendant gave him cash for his return. When Robert Forget got back to the State of Washington, he called his best friend,

Gerald Osborne, and told him what had happened. Shortly thereafter, Forget received a long distance call from the defendant, saying "Everything is taken care of. I will be in Los Angeles in a few days. See you then."

A few days later, the defendant called Mr. Forget from Los Angeles and asked him to come and get his money, $25,000. Forget was surprised since he had done nothing for Tshombe. He met the defendant at a bank on Wilshire Boulevard and had a conversation with Dr. Abraham, and then realized that this man was buying the hospital. Forget did not get $25,000; he received $10,000 instead. While in Los Angeles he was frequently driven around town by the defendant in his 280 SL Mercedes-Benz. During one of these trips Forget inquired about Norma Wilson. In response the defendant opened the glove compartment. Forget recognized therein Mrs. Wilson's passport, and wrapped in a handkerchief he also found her emerald ring, diamond watch bracelet without the mechanism, and a pearl choker. Defendant said he had gone through customs with these items using the ruse of saying he had an eye cut which required immediate treatment. He held his handkerchief full of the gems to his "injured" eye and the officials simply showed him through the line without inspecting him. The defendant told Forget the green stone was worth $30,000.

Norma Wilson's distinctive jewelry was familiar to many persons and her friends described the emerald-colored stone in her ring which was flanked by diamonds, her diamond watch and the double strand of pearls and earrings which she customarily wore. Her husband said she was wearing these items when she left the country. When Robert Forget found the items in the glove compartment he offered to dispose of them for the defendant. The defendant suggested that when he had completed that task he could call defendant's answering service and simply leave the message "Gregory called." Although Forget then said he didn't want to hear any more about the events relating to Norma Wilson, defendant later pointed his right hand at Forget's temple and said that "She never felt a thing. It's amazing what a .09 mm. will do. The whole side of her head came off." The defendant also mentioned that he had disposed of her coat in a locker at a bus or a railroad depot.

Mr. Forget returned to Washington and took the jewelry with him. In April defendant called to tell Mr. Forget to expect a visit shortly from members of the district attorney's office who were investigating. He devised a story that the defendant had left Mrs. Wilson in Sweden or Switzerland and she was going to obtain a face lift that would take about six weeks. If she disappeared, it would appear that anyone might have committed the

crime for the jewelry that she always wore or the money she might have been carrying. Meanwhile, Forget had shown these items to a person named Homer Brake in Washington to determine their worth. When the investigators arrived he told the fabricated story and declared that he had accompanied the defendant as body guard and interpreter on their trip. That night after the interview, however, he experienced a dream that seemed like a heart attack, and he awakened sitting up in bed. The next day he scattered the diamonds from the watch bracelet and the pearls from the necklace along a country road as he drove. He then drove to a pond in the country near an area where he used to hunt and his companion, Colleen, threw the green gem into the clear water from which Forget believed he might later be able to retrieve it. When he confessed this conduct to Mr. Burnett, an investigator with Los Angeles district attorney's office in March 1970, they returned to the scene but were unable to find any of the jewels.

The district attorney's office conducted an extensive search of European records with the cooperation of law enforcement and detective bureaus in foreign countries. They found no record of Norma Wilson having been in Geneva, Switzerland. In that country it is mandatory that a hotel owner control passports and show name, birth date and nationality of all guests, information which is file-indexed for police investigation and frequently referred to. They did discover that defendant had been at the Richmond Hotel (in Switzerland) on November 23, 1968; photographs of defendant were on file with Zurich police. No unidentified corpse ever turned up in any of the European cities or areas investigated.

In September 1970, Mr. Thompkins of the Police Sureté of Geneva contacted the district attorney's office to tell him that a box containing clothing had been found at the railway station. The clothing appeared to be similar to that Norma Wilson was reported as having worn at the time of her disappearance. Apparently, the box had been removed from a locker in July 1969 and placed in a locked room, but it was not opened for a search of the contents until 1970. Inside were blood-stained garments, a handbag and a wallet stained with blood, and the victim's coat and lingerie. There was testimony by DeWayne Wolfer, criminalist for Los Angeles County, that the blood when fresh had flowed from two head wounds down over the body of the person wearing the clothing. The blood, which was old human blood, was Type A and matched that of Mrs. Norma R. Carty" (the name of the victim before her marriage to Wilson), as described at an earlier time by records of Scripps Hospital in La Jolla, California. It was believed that the clothing was contaminated with organic material, twigs and debris because the body had been dragged through a wooded area.

A record of the sale of a Browning 9 mm. high-power automatic pistol

to Thomas Devins by the Hollywood Gun Shop was introduced. The gun, which Dr. Mahlzacher, the father of Mrs. Adelle Devins, turned over to the district attorney's investigator, Murphy, was fully loaded with one round in the chamber. An expert testified that the gun had been placed in commerce sometime in the second quarter of 1968.

The results of Mr. Burnett's investigation in Europe disclosed that Mrs. Wilson had arrived in Madrid, Spain. From there she had gone to Malaga and thence she proceeded by ferry boat to Tangiers in Morocco and then to Casablanca. From Casablanca she flew to Paris and from there to Zurich, Switzerland. She was last found checking into the Hotel Muralto in Locarno, Switzerland and thereafter no one heard from her again. Investigation disclosed no trace of Mrs. Wilson in Geneva. Locarno is in the southern section of Switzerland on the Swiss-Italian border. The roads nearby are narrow; and the area is mountainous with crevasses and drops thousands of feet, many lakes and woods; it is very sparsely populated.

On June 25, 1969, Mr. Burnett received a call from the defendant around 10:30 in the morning; defendant said he did not trust Mr. Wilson. There followed a conversation in which Mr. Burnett suggested that since defendant was the last person to have been seen with Mrs. Wilson, and was a suspect in the case, Mr. Burnett wanted to discuss the matter with him. He said that he needed the defendant's cooperation but he wanted him to understand that if he came to the district attorney's office, it was to be entirely free and voluntary on his part. The defendant visited the district attorney's office and told him about the trip to Europe, but left out many of the details. When Mr. Burnett inquired who "Okuma Aikba" was, the defendant told him it is a synonym for "Thomas Devins"; that this was a fictitious individual and his alias. He admitted that he signed both "Okuma Aikba" and also his true name as "Thomas Devins."

It was not until March 4, 1970, that Mr. Burnett was contacted by Robert Forget. After he received a statement from Forget he concentrated the investigation on corroboration of that story. One of the things Forget mentioned was that Mrs. Wilson's coat had been placed in a locker in Switzerland. He also said he had seen her passport and her jewels in the defendant's possession on his return to the United States. When the defendant was later arrested in Los Angeles his automobile was searched and a box of colored slides, with pictures of the defendant and Mrs. Wilson taken in Europe, were discovered there.

Defendant contends that the court lacked jurisdiction to conduct the trial with respect to the charges of murder and robbery. Defendant further

contends that the 9 mm. Browning automatic was improperly received in evidence and that hospital records, evidence of another offense, certain testimony of Robert Forget, of Colonel Westenberger and of Mr. Burnett were improperly admitted.

For the reasons set forth below we conclude that defendant is correct as to the lack of jurisdiction over the murder charge, but that the other contentions are without merit

■ The defendant first contends that, because the physical acts relating to the murder and robbery took place outside the state of California, the courts of this state had no jurisdiction with respect to those charges. We conclude that, under the present state of decisional law in California, the trial court had jurisdiction over the robbery count, but not over the murder count.

Two sections of the Penal Code are applicable to the problem before us. They are sections 27 and 778a of the Penal Code, which read as follows:

Section 27: "The following persons are liable to punishment under the laws of this state:

"1. All persons who commit, in whole or in part, any crime within this state;

"2. All who commit any offense without this state which, if committed within this state, would be larceny, robbery, or embezzlement under the laws of this state, and bring the property stolen or embezzled, or any part of it, or are found with it, or any part of it, within this state;

"3. All who, being without this state, cause or aid, advise or encourage, another person to commit a crime within this state, and are afterwards found therein."

Section 778a: "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state."

The evidence shows that defendant brought the jewelry to California, where he turned it over to Forget. The express language of subdivision 2 of section 27 confers jurisdiction on the trial court over the robbery count. The case law so holds. (*People* v. *Case* (1957) 49 Cal.2d 24 [313 P.2d 840].)

■ However, although a literal reading of subdivision 1 of section 27,

and of section 778a, would seem to support jurisdiction over the murder count also, those sections have a history of judicial construction, binding on us in the case at bench, which requires us to read the statutory language in a manner more restrictive than a literal reading would suggest.

In *People* v. *Buffum* (1953) 40 Cal.2d 709 [256 P.2d 317], the Supreme Court construed the two sections above quoted and held that they required the doing, in California, of an act amounting to an "attempt" to commit the offense charged, within the definition of attempt in criminal cases generally—i.e., that there must be acts beyond mere preparation. Although there can be no doubt that there is no constitutional objection to a broader interpretation (cf. *People* v. *Burt* (1955) 45 Cal.2d 311 [288 P.2d 503, 51 A.L.R.2d 948]; 29 So.Cal.L.Rev. 363), and although the *Buffum* decision has been strongly criticized (13 Stan. L.Rev. 747; 38 Texas L.Rev. 780; 64 Mich. L.Rev. 624, 625; 72 Harv. L.Rev. 945), that case remains the law of California (cf. *People* v. *Anderson* (1961) 55 Cal.2d 655, 661 [12 Cal.Rptr. 500, 361 P.2d 32]), and we have no choice but to apply it in the case at bench.[1]

The only acts of defendant which this record discloses which relate to the murder count are the act of inducing Mrs. Wilson to undertake the fatal trip, inferentially the act of purchasing the tickets, and the acquisition of the assumed murder weapon. The only direct evidence on the formation of the intent to kill is in Forget's testimony concerning a conversation in Spain, although from other things in the record it might be inferred that defendant had held that intent before the party left Los Angeles for Montreal. Giving the fullest possible effect to the whole record, clearly it falls short of an "attempt." It follows that, on the record before us, the trial court had no jurisdiction over the murder count.

The defendant next contends that the 9 mm. Browning automatic pistol was improperly received in evidence since its discovery resulted from a disclosure made by him without waiver of his *Miranda* rights. The facts brought out at the hearing on the motion to suppress show that the defendant was arrested on or about April 7, 1970, in Santa Monica and taken to the Bureau of Investigation in Los Angeles where he was interrogated by Deputy District Attorney Richard Hecht. First, Hecht read the charges to the defendant and thereafter he read to him his constitutional rights. He asked the defendant if he understood these rights and the defendant responded that he did. The deputy then requested and received permission to search the house on Wonderland Avenue where defendant

---

[1]A Court of Appeal, although bound by precedents laid down by a higher court, is not thereby gagged. (6 Witkin, Cal. Procedure (2d ed. 1970) p. 4579, Appeal, § 665.)

had been residing with Michele Vurpillat. Mr. Burnett later searched the residence, which was occupied by Michele and another girl. He did not find the Browning automatic either at that location or in the defendant's safe deposit box, for the search of which he had secured a warrant. However, during the investigation Mr. Burnett discovered a deed of Malibu property transferred to Jeannette Graham by Michele Vurpillat. He was reminded that Jeannette's name had been mentioned in earlier exploratory discussions. Inquiry disclosed that Jeannette Graham was a nurse in the office of Dr. Mahlzacher, father of Adele Devins, defendant's wife. The doctor's office was in the State of Washington and upon inquiry by telephone his nurse disclosed that the 9 mm. Browning automatic was there. One of the detectives from the Los Angeles District Attorney's office picked up the gun from Dr. Mahlzacher, who said he was given the gun by the defendant the year before. The gun was properly admitted into evidence. ■ "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficent evidence that he knows of his rights and chooses not to exercise them." (*People* v. *Johnson,* 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865].)

■ The defendant further contends that evidence relating to another fraudulent real estate transaction, with which he was not charged, was improperly admitted. The evidence about which defendant complains shows that on September 27, 1967, the defendant, as broker, instituted an escrow for transfer of a residence on North Larrabie Street, naming Samuel and Cecile Jay as sellers and Jack Shitmeyer as the purchaser; the latter was to give a secured note as part of the consideration. The maintenance man for the La Cienega office building, who had once posed as the defendant's "brother" for Mrs. Jay's benefit, testified that he knew the pseudonym "Jack Shitmeyer" as a jocular alias for the defendant.

Cecile Jay was an elderly woman who, in prior years, had been a customer of defendant in the purchase of vacant property in Malibu. She testified that she never met "Jack Shitmeyer," the alleged purchaser of her residence, because he failed to appear at the times designated for appointments. Finally, she investigated and discovered that there was no address such as that the defendant had given her for "Jack Shitmeyer." When she confronted the defendant with this information he volunteered to reduce the real estate commission and take the building himself, but he thereafter so modified the escrow documents that Mrs. Jay received only his unsecured note for the property and nominal payments of cash. Ultimately, defendant failed to make payments on a loan he had secured from Home Savings and he so encumbered the property that Mrs. Jay was forced to pay approxi-

mately $12,000 in order to obtain the title once again. Meanwhile, the defendant had solicited Mrs. Jay to purchase for $75,000 Glen Gould's interest in the proposed real estate development on San Vincente in which Norma Wilson was involved, but Mrs. Jay refused.

Prior acts of misconduct by a defendant are admissible relative to the crime charged insofar as credibility, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in his dealings are concerned. (Evid. Code, §§ 1101, subd. (b), 1101, subd. (c); *People* v. *Kelley,* 66 Cal.2d 232, 242-243 [57 Cal.Rptr. 363, 424 P.2d 947].) In the present case the similarities between the real estate transactions in which the defendant had involved two elderly women, Norma Wilson and Cecile Jay, respectively, are clear. In the course of defrauding the women the defendant resorted to use of the fictitious names, "Okuma Aikba" and "Jack Shitmeyer." The similarities in these transactions disclose a customary modus operandi by defendant which renders the Jay transaction admissible in evidence against him. (*People* v. *Griffin,* 66 Cal. 2d 459-467 [58 Cal.Rptr. 107, 426 P.2d 507]; *People* v. *Webster,* 14 Cal. App.3d 738, 746 [93 Cal.Rptr. 260].)

■ The defendant contends in addition that Colonel Westenberger, a firearms enforcement officer with the Alcohol, Tobacco and Firearms Division of the U.S. Treasury Department, should not have been permitted to testify as to the probable date of manufacture of the Browning automatic pistol because his opinion was founded upon heresay information. Colonel Westenberger had learned from Mr. Peters of Herstel, Belgium, a representative of Browning Arms United States, their method of marking pistol barrels to designate the approximate date of manufacture. The credibility of this qualified expert and the validity of the information upon which he based his opinion was properly determined by the trier of fact. (See *People* v. *Schindler,* 273 Cal.App.2d 624, 643 [78 Cal.Rptr. 633]; *People* v. *Lewis,* 186 Cal.App.2d 585, 601 [9 Cal.Rptr. 263].)

■ Defendant claims that the admission of hospital records relating to the blood type of the victim violated the hearsay rule and their admissibility cannot be sustained by the business records exception (Evid. Code, § 1271). Although he concedes that the present custodian of the records testified that they were prepared in the regular course of business, he argues that there is no evidence that the writing was made at or near the time the blood test was made. This contention cannot be sustained in light of the dates which appear on the records indicating the time of the entry and the test, the presumption being that such information is accurate. (Evid. Code, § 640.) The defendant raised no objection in the trial court regard-

ing lack of foundation as to time of preparation, and is not entitled now to dispute it on appeal. (*People* v. *Carter,* 192 Cal.App.2d 648, 661 [13 Cal.Rptr. 541].) The defendant contends further that nothing was known about the technician who performed the blood test or the sample of blood upon which the test was based. In view of the fact that merely the mechanics of blood typing was involved, it appears this argument has no real legal significance under the circumstances of this case, and the records were properly admitted under the business records exception. (See *People* v. *Gorgol,* 122 Cal.App.2d 281, 297-302 [265 P.2d 69].)

■ Defendant's further contention is that the court improperly permitted another witness, Gerald Osborne, to testify relating to incidents which Robert Forget had told him, shortly after Forget's return to the United States, about what had taken place on the trip to Europe and North Africa with defendant and Norma Wilson. These prior consistent statements were admitted within the discretion of the trial court on the grounds that it showed that Forget's testimony was not a recent fabrication. (Evid. Code, §§ 791, 1236; *People* v. *Kynette,* 15 Cal.2d 731, 733 [104 P.2d 794], overruled on another point in *People* v. *Snyder,* 50 Cal.2d 190, 197 [324 P.2d 1]; *People* v. *Hernandez,* 263 Cal.App.2d 242, 255-256 [69 Cal.Rptr. 448].)

■ Defendant also urges that two witnesses were permitted to testify to extrajudicial statements made to them by Norma Wilson which were inadmissible hearsay. The prosecution's principal theory was that Norma Wilson was enticed to leave the country by defendant's false promises of meeting with foreign investors. As a consequence, the state of Mrs. Wilson's mind with respect to the defendant's representations and her reasons for leaving the country were significant. Grace Barnum, sister of the victim, testified that she had been told by Mrs. Wilson that the defendant had called her from Montreal and asked her to meet him there because he had people for her to meet from whom large sums of money could be borrowed for investment in the proposed real estate development. Mr. Wilson, husband of the victim, similarly testified that his wife had received a call from the defendant and had gone to Canada believing his representation that money would be forthcoming from potential investors she would meet there. Such statements relative to showing Mrs. Wilson's state of mind or to explain her conduct are admissible. (Evid. Code, § 1250; *People* v. *Alcalde,* 24 Cal.2d 177, 187-188 [148 P.2d 627].)

■ Defendant also contends that the testimony of the district attorney's office investigator, Mr. Burnett, that a woman referred to by him as "Mrs. Forget" or "Judy" had pointed out to him the location where the emerald green stone from Mrs. Wilson's ring had been discarded, was

hearsay and inadmissible. The investigator thus refers to the woman, not Forget's wife, who, according to Robert Forget's testimony, accompanied him when he tossed the green stone in the pond; Forget called her "Colleen." Mr. Burnett testified that both Robert Forget and his woman companion cooperated in pointing out, during the course of the deputy's investigation, the point where, to their best knowledge, the ring had entered the water since he wanted to make a thorough search for such evidence. Robert Forget had already testified that he had requested his companion to accompany him on a drive to throw the gem into the pond. The statement does not appear to fall within the hearsay restriction and, in any event, there is no showing of prejudice from its admission.

■ Finally, the defendant contends that the prosecutor's offer to stipulate to reopen the case, because the defendant objected that Mr. Forget's woman companion had not been called upon to testify in corroboration of the statement that she had pointed out the gem's presumed point of disposition, constituted misconduct. The prosecutor's offer to reopen the case to prove his own lack of intent at deception is not misconduct, which is properly defined as a dishonest action or attempt to persuade the jury by deception or other reprehensible method. (*People* v. *Asta,* 251 Cal.App.2d 64, 85 [59 Cal.Rptr. 206].)

The judgment is modified, reversed in part and affirmed in part, as follows: (1) the judgment on count I is reversed; (2) the judgment on counts II, IV and V is affirmed; (3) the judgment is modified by deleting the reference to count III; the sentence contained in said judgment is vacated and the case is remanded to the trial court for further proceedings consistent with this opinion.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied April 3, 1972, and the petitions of the appellant and the respondent for a hearing by the Supreme Court were denied July 5, 1972.