[No. A115390. First Dist., Div. Two. May 21, 2007.]

CHRISTIAN ELLIS HAGESETH, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of Discussion.

COUNSEL

Carleton L. Briggs for Petitioner.

No appearance for Respondent.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Gerald A. Engler, Assistant Attorneys General, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General; James P. Fox, District Attorney, and Jennifer M. Ow, Deputy District Attorney, for Real Party in Interest.

Edmund G. Brown, Jr., Attorney General, Carlos Ramirez, Assistant Attorney General, Jose Guerrero and Kerry Weisel, Deputy Attorneys General, for Medical Board of California as Amicus Curiae on behalf of Real Party in Interest.

OPINION

**KLINE, P. J.**—This writ petition presents the question whether a defendant who was never himself physically present in this state at any time during the commission of the criminal offense with which he is charged, and did not act through an agent ever present in this state, is subject to the criminal jurisdiction of respondent court even though no jurisdictional statute specifically extends the extraterritorial jurisdiction of California courts for the particular crime with which he is charged. After determining that this writ proceeding is not premature, we shall conclude that territorial jurisdiction to prosecute lies under the traditionally applicable legal principles, and it makes no difference that the charged conduct took place in cyberspace rather than real space.

### FACTS AND PROCEEDINGS BELOW

On May 24, 2006, the San Mateo County District Attorney filed a criminal complaint charging petitioner with the felony offense of practicing medicine in California without a license in violation of section 2052 of the Business and Professions Code. Section 2052 provides that any person who "practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any . . . physical or

mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the state prison, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment." Petitioner, whose allegedly unlawful conduct consisted entirely of Internet-mediated communications, claims the trial court lacks jurisdiction because no part of that conduct took place within the State of California.

The complaint is predicated on an investigative report of the Medical Board of California (Board) dated April 20, 2006, which the Board forwarded to the San Mateo County District Attorney as part of its referral of the case for criminal prosecution. The report states that, on or about June 11, 2005, John McKay, a resident of San Mateo County, initiated an online purchase of fluoxetine (generic Prozac) on "www.usanetrx.com," an interactive Web site located outside of the United States. The questionnaire McKay received and returned online, which identified him as a resident of this state, was forwarded by operators of the Web site to JRB Health Solutions (JRB) for processing. JRB, which has its headquarters in Florida and operates a server in Texas, forwarded McKay's purchase request and questionnaire to petitioner, its "physician subcontractor," who resided in Fort Collins, Colorado, and was then licensed to practice medicine in that state.[1] After reviewing McKay's answers to the questionnaire,[2] petitioner issued an online prescription of the requested medication and returned it to JRB's server in Texas. JRB then forwarded the prescription to the Gruich Pharmacy Shoppe in Biloxi, Mississippi, which filled the prescription and mailed the requested amount of fluoxetine to McKay at his California address. Several weeks later, intoxicated on alcohol and with a detectable amount of fluoxetine in his blood, McKay committed suicide by means of carbon monoxide poisoning. The Board's report indicates, and it is undisputed, that petitioner was at all material times located in Colorado and never directly communicated with

[1] The Board investigative report indicates petitioner's Colorado medical license was restricted to "research and independent medical exams only." The People take the position that the status of petitioner's license is "immaterial."

[2] In the questionnaire, McKay stated his name, age, sex, height, weight, and phone number; that the requested fluoxetine should be shipped to him at an address in Menlo Park, California; that he had not previously taken fluoxetine, does not have high blood pressure, "agrees to consult a pharmacist before taking any over-the-counter medications," and is "not suicidal, homicidal, or assaultive"; that he sought fluoxetine as "[t]reatment for the symptoms of adult attention deficit disorder in relation to depression"; that his symptoms were "[m]oderate depression and major attention deficit"; that he has no "current medical conditions," is currently taking no other medications and does not plan to do so; and that he has no allergies, has had no "major medical procedures," and no "relevant medical history."

anyone in California regarding the prescription. His communications were only with JRB, from whom he received McKay's online request for fluoxetine and questionnaire, and to whom he sent the prescription he issued.

On May 24, 2006, the district attorney filed a criminal complaint charging that, "in the County of San Mateo," petitioner willfully and unlawfully practiced medicine in this state without a valid license authorizing him to do so, in violation of Business and Professions Code section 2052, a felony. On the same date, the trial court issued a warrant for petitioner's arrest and admitting him to bail in the amount of $500,000. Petitioner quickly demurred to the complaint and moved to quash the warrant and to dismiss the complaint. All such relief was sought on the ground that, because all the alleged criminal acts occurred outside the state, the court lacked jurisdiction. At a hearing conducted on August 2, 2006, the trial court concluded that the complaint was "sufficient" to survive demurrer. In overruling the demurrer and denying the motion to dismiss, the court stated that "it's a very interesting matter and you may win at the preliminary hearing," but denied the relief sought because "I'm not convinced yet that there isn't jurisdiction within the state of California." The motions to dismiss and to quash the arrest warrant were both denied.

The instant writ petition was filed on October 3, 2006. We issued an order staying all proceedings in the superior court and thereafter an order to show cause.

## DISCUSSION

### I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.

### *Under Traditionally Applicable Principles, Jurisdiction Lies*

The issue of personal or territorial jurisdiction based on Internet or "network-mediated" contacts has drawn far more judicial and academic attention in civil than in criminal proceedings. Under the "minimum contacts" analysis adopted in *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 319 [90 L.Ed. 95, 66 S.Ct. 154], a forum state cannot assert personal jurisdiction over an out-of-state resident in a civil proceeding unless he has purposefully availed himself of the privileges and benefits of conducting activities within

---

*See footnote, *ante*, page 1399.

the forum. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559]; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 446 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; see also *Hanson v. Denckla* (1958) 357 U.S. 235, 253 [72 L.Ed.2d 1283, 8 S.Ct. 1228].) "The fact that many companies have established virtual beachheads on the Internet and the fact that the Internet is now accessible from almost any point on the globe have created complex, new considerations in counting minimum contacts for purposes of determining personal jurisdiction." (*Butler v. Beer Across America* (N.D.Ala. 2000) 83 F.Supp.2d 1261, 1267–1268.) The purposeful availment requirement has been applied in a civil case involving the practice of medicine in this state by out-of-state physicians who did not employ the Internet (*Cubbage v. Merchent* (9th Cir. 1984) 744 F.2d 665),[7] and in other types of civil cases involving Internet contacts. The application of traditional jurisdictional principles to civil proceedings involving Internet-mediated contacts is now a matter of considerable controversy.[8]

■ Unlike civil actions, criminal proceedings cannot take place in the absence of the defendant, because the confrontation clause of the Sixth Amendment bars criminal default judgments. Because criminal cases are therefore "not subject to the same flexibility enjoyed by the more elastic rules governing extraterritorial jurisdiction in civil cases" (*State v. McCormick* (Minn. 1978) 273 N.W.2d 624, 628), "[t]he rule is well-settled that civil 'minimum contacts' analysis has no place in determining whether a state may

---

[7] In the scenario most frequently presented in civil actions, which are invariably for medical malpractice, the prospective patient travels out of state to a physician and there receives allegedly negligent medical treatment. In those cases, which ordinarily do not involve an intentional tort, "courts consistently hold that the patient's home state courts cannot exercise personal jurisdiction over the physician even though the *effects* of the doctor's negligence are (literally) felt in the patient's home state." (*Prince v. Urban* (1996) 49 Cal.App.4th 1056, 1057–1058 [57 Cal.Rptr.2d 181], citing, by way of examples, *Ghanem v. Kay* (D.D.C. 1984) 624 F.Supp. 23; *Walters v. St. Elizabeth Hosp. Medical Center* (W.D.Pa. 1982) 543 F.Supp. 559; *Lebkuecher v. Loquasto* (1978) 255 Pa.Super. 608 [389 A.2d 143]; *Cambre v. St. Paul Fire and Marine Insurance Co.* (La.Ct.App. 1976) 331 So.2d 585; *McAndrew v. Burnett* (M.D.Pa. 1974) 374 F.Supp. 460; *Gelineau v. New York University Hospital* (D.N.J. 1974) 375 F.Supp. 661.)

[8] See, e.g., Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts* (2006) 2006 U.Ill. L.Rev. 71; Reidenberg, *Technology and Internet Jurisdiction* (2005) 153 U.Pa. L.Rev. 1951; Salvado, *An Effective Personal Jurisdiction Doctrine for the Internet* (2003) 12 U.Balt. Intell. Prop. L.J. 75; Geist, *Cyberlaw 2.0* (2003) 44 B.C. L.Rev. 323; Geist, *Is There a There There? Toward Greater Certainty for Internet Jurisdiction* (2001) 16 Berkeley Tech. L.J. 1345; Redish, *Of New Wine and Old Bottles: Personal Jurisdiction, the Internet, and the Nature of Constitutional Evolution* (1998) 38 Jurimetrics J. 575; Goldsmith, *Against Cyberanarchy* (1998) 65 U.Chi. L.Rev. 1199; Johnson and Post, *Law and Borders—The Rise of Law in Cyberspace* (1996) 48 Stan. L.Rev. 1367.

assert criminal personal jurisdiction over a foreign defendant."[9] (*State v. Amoroso* (1999) 1999 UT App 60 [975 P.2d 505, 508]; accord, *Vasquez, petitioner* (1999) 428 Mass. 842 [705 N.E.2d 606]; *Boyd v. Meachum* (2d Cir. 1996) 77 F.3d 60, 66; *State v. Taylor* (Tex. Ct.App. 1992) 838 S.W.2d 895, 897; *Rios v. State* (Wyo. 1987) 733 P.2d 242, 244; *State v. Luv Pharmacy, Inc.* (1978) 118 N.H. 398, 403–404 [388 A.2d 190, 193–194].)

■ "Like most other states, California has addressed the problem of criminal activity that spans more than one state by adopting statutes that provide our state with broader jurisdiction over interstate crimes than existed at common law. Such laws generally 'are premised on the belief that a state should have jurisdiction over those whose conduct affects persons in the state or an interest of the state, provided that it is not unjust under the circumstances to subject the defendant to the laws of the state.' (Model Pen. Code & Commentaries, com. 1 to § 1.03, p. 35.) Penal Code section 27 generally permits the punishment of a defendant under California law for any crime committed 'in whole or in part' in the state. (§ 27, subd. (a)(1).) In addition, sections 27 and 777b through 778b establish territorial jurisdiction for specific types of interstate situations or particular crimes. For example, a person who, acting outside the state, aids, advises, or encourages a person in the state to commit a crime in California can be punished in California in the same manner as if he or she had acted within the state. (§§ 27, subd. (a)(3), 778b.) A person who kidnaps someone in California and takes that victim to another state or country may be punished in California for any crime of violence or theft committed against the kidnap victim in the other state or country. (§ 778a, subd. (b).) Anyone who commits larceny, carjacking, or embezzlement may be punished in California if the property taken is brought into the state. (§ 27, subd. (a)(2).)" (*People v. Betts* (2005) 34 Cal.4th 1039, 1047 [23 Cal.Rptr.3d 138, 103 P.3d 883].)

With the parties, we agree that the jurisdictional statutes applicable to this case are Penal Code section 27, subdivision (a)(1), and Penal Code section 778. (Unless otherwise indicated, all statutory references are to the Penal Code.) As noted, section 27 simply states that "persons are liable to punishment under the laws of this state . . . [¶] . . . who commit, in whole or in part, any crime within this state." Section 778 states in its entirety as follows: "When the commission of a public offense, commenced without the State, is consummated within its boundaries by a defendant, himself outside the State, through the intervention of an innocent or guilty agent or any other means proceeding directly from said defendant, he is liable to punishment therefor in

---

[9] "Minimum contacts" may, however, be applied in criminal cases involving a corporate defendant due to distinctions between corporate and individual defendants. (See *U.S. v. Nippon Paper Industries Co., Ltd.* (D.Mass. 1996) 944 F.Supp. 55, 60–61, revd. on other grounds (1st Cir. 1997) 109 F.3d 1, cert. den. (1998) 522 U.S. 1044 [139 L.Ed.2d 632, 118 S.Ct. 685].)

this State in any competent court within the jurisdictional territory of which the offense is consummated."

▪ The question whether sections 27 and 778 confer jurisdiction over petitioner's interstate activity, rendering the law of this state applicable, involves issues of fact; nevertheless, it is to be decided by the court prior to trial, not by a jury. (*People v. Betts, supra*, 34 Cal.4th at pp. 1049–1054.) Territorial jurisdiction establishes no more than the court's authority to try the defendant, a procedural matter that does not itself determine the defendant's innocence or guilt. (*Id.* at pp. 1050, 1052–1053 ["The circumstance that the language of the statutes refers to the liability of persons to punishment under California law, rather than the authority of California courts to hold those persons criminally liable, does not signify that the Legislature intended to transform jurisdictional facts into substantive elements of the offense"].) Because they are not elements of a crime, "jurisdictional facts need be proved only by a preponderance of the evidence and not beyond a reasonable doubt." (*Id.* at p. 1053, citing *People v. Cavanaugh* (1955) 44 Cal.2d 252, 262 [282 P.2d 53].) The lack of clarity as to whether a trial court's application of the law to the facts should be reviewed independently or deferentially (*People v. Betts*, at p. 1055) presents no problem in this case. For the purpose of determining jurisdiction, petitioner fully accepts and indeed relies upon the facts set forth in the Board investigative report submitted to the court by the People. In other words, the parties agree petitioner was not physically in this state at any time between the commencement and consummation of the alleged offense, and no agent located within the state ever intervened in his behalf during that period of time. Because the dispute before us is therefore essentially one of law only, our review is de novo.

Petitioner maintains he committed no "part" of the offense in California, as section 27 requires, and does not come within the purview of section 778 because he did not use an "agent or some other means" to consummate a crime in California. Petitioner maintains that his "act of practicing medicine began and ended with the writing of the prescription in Colorado," and "[t]he filling of the prescription, which occurred in Mississippi, was an entirely separate act, requiring a separate license," for which he cannot be held criminally accountable. As petitioner sees the matter, it is irrelevant whether he knew the medication he prescribed would be sent to California because his act ended with the writing of the prescription, and section 778 does not make his knowledge of the fact that the medication he prescribed would be sent to California a determining or even a relevant factor. Acknowledging cases finding personal jurisdiction in cases in which some *portion* of the alleged crime was committed within the state by the defendant or his agent (see, e.g., *People v. Betts, supra*, 34 Cal.4th 1039; *People v. Anderson* (1961) 55 Cal.2d 655 [12 Cal.Rptr. 500, 361 P.2d 32]; *People v. Botkin* (1901) 132 Cal. 231 [64 P. 286]; *Ex Parte Hedley* (1866) 31 Cal. 108; *People v. Brown* (2001) 91

Cal.App.4th 256 [109 Cal.Rptr.2d 879]; *People v. Sansom* (1918) 37 Cal.App. 435 [173 P. 1107]), petitioner maintains that the trial court lacked territorial jurisdiction to adjudicate the crime with which he is charged because "no part of the offense was committed [either by him or by any agent of his] within the boundaries of California." The validity of petitioner's argument turns on the meaning of section 778.

The enactment of section 778, in 1872, was apparently inspired by the opinion six years earlier in *Ex Parte Hedley, supra,* 31 Cal. 108, a habeas corpus proceeding in which the jurisdictional issue was resolved on the basis of common law principles. In that case, Hedley, an agent of Wells, Fargo & Co., residing in Nevada, was alleged to have drawn telegraphic checks upon his principals at San Francisco, in favor of his San Francisco broker for his own purposes and without the knowledge of his principals. Hedley sought relief on the ground the allegations did not make out a case of embezzlement, but he additionally maintained that, even if it did, "the offense was not committed in this State, and that therefore our Courts have no jurisdiction." (*Id.* at p. 114.) The court rejected both claims. With respect to the second claim, the court reasoned as follows: "The offense, though commenced without this State, was consummated within it, and the offender having been found in the State and arrested therein, is clearly amenable to its criminal justice. [Citations.] 'Where the commission of a public offense commenced without the State is consummated within the boundaries thereof, the defendant shall be liable to punishment in this State though he were without the State at the time of the commission of the offense charged, provided he consummated the offense through the intervention of an innocent or guilty agent without this State, or any other means proceeding directly from himself; and in such case the jurisdiction shall be in the county in which the offense is consummated.' [Citation.]" (*Ibid.,* quoting 1 Hitt. Dig., art. 1,673.) Significantly, immediately after quoting the foregoing language, *Hedley* states that "[t]he word 'without' occurs twice in this provision, but it is apparent that in the instance in which it is used last, the word 'within' was the word really intended. The provision must therefore be so read. [Citations.]" (*Ex Parte Hedley,* at p. 114.) This statement, together with the fact that Hedley's agent, Burling, was at all material times a resident broker in San Francisco, indicates that, under *Hedley,* territorial jurisdiction exists only where the defendant or his agent was within the state at some time between the commencement and consummation of the offense.[10]

---

[10] Section 786, which was enacted after *Hedley* was decided and at the same time the Legislature enacted section 778, now provides that where a person outside California receives property there with the knowledge it was embezzled in this state (as in *Hedley*) "the jurisdiction of the offense is in any competent court within either jurisdictional territory." (§ 786, subd. (a).)

Though the enactment of section 778 was undoubtedly motivated by the opinion in *Hedley*, its language differs in that the Legislature dropped the "without" that *Hedley* interpreted as "within." The statutory language therefore appears to apply to an offense consummated within the boundaries of the state by a defendant himself outside the state "through the intervention of an innocent or guilty agent or any other means proceeding directly from said defendant" (§ 778), *regardless whether the agent or other means employed was within the state at any relevant time.*

During 135 years that have passed since its enactment,[11] section 778 has been invoked by our courts on remarkably few occasions, none of them stimulating more than superficial analysis.[12] The first judicial construction of the provision was by this court 40 years ago in *People v. Jones* (1967) 257 Cal.App.2d 235 [64 Cal.Rptr. 622], questioned on other grounds in *In re King* (1970) 3 Cal.3d 226, 237 [90 Cal.Rptr. 15, 474 P.2d 983]. The appellant in *Jones* had been convicted of a violation of section 270, which provides that a parent of a minor child " 'who willfully omits without lawful excuse' " to furnish necessary support for such child is guilty of a criminal offense. (*Jones,* at p. 235.) The appellant and the mother of the child were divorced in Florida in 1957, where the three then resided. A year later, the mother and child moved to California. During a three-year period, when the mother and child resided in Monterey County, the appellant failed to furnish any support for the child except a single payment of $65 made in May 1963, pursuant to a reciprocal support order made in Ohio, the state in which he then lived. (*Id.* at p. 236.)

The appellant's sole defense on appeal was that " '[a] non-resident of this state who has never been in this state cannot commit an offense within this state.' " (*People v. Jones, supra,* 257 Cal.App.2d at p. 236.) We disagreed, noting that the offense was committed at the place where the child resides. (*Ibid.*) In response to the defendant's contention that he committed no " 'overt act' " in this state, we pointed out that " '[t]he offense of failing to provide support for minor children is a crime of omission rather than

---

[11] The only amendment of the provision was in 1951, when the Legislature "shifted a number of phrases for more understandable reading without changing the meaning of the section, except that it fixed jurisdiction 'in any competent court within the jurisdictional territory of which the offense is consummated' instead of 'in the county in which the offense is consummated.' " (Historical Note, 50 West's Ann. Pen. Code (1985 ed.) foll. § 778, p. 161, citing Stats. 1851, ch. 29, § 85, p. 221.)

[12] Section 778 appears to have been cited by other courts only twice: by the Ninth Circuit in a case finding it inapplicable (*Ex Parte Davis* (9th Cir. 1931) 54 F.2d 723, 727), and by the Supreme Court of Nevada, which found it relevant to the question whether a defendant could be extradited from that state to California (*Sheriff v. Thompson* (S.Ct. 1969) 85 Nev. 211 [452 P.2d 911, 915]).

commission' " and caused " 'a condition of dependency and destitute circumstances . . .' [citation]" within this state. (*Id.* at p. 237.) We viewed section 778 as showing "legislative recognition of the concept that a defendant may violate a California penal statute even though outside of the state at the time of its commission" (*Jones,* at p. 237), and as consistent with the rule of *Strassheim v. Daily* (1911) 221 U.S. 280, 285 [55 L.Ed. 735, 31 S.Ct. 558], that a state may exercise jurisdiction over criminal acts that are committed outside the state but are intended to, and do, produce harm within the state. (*People v. Jones,* at p. 237.)[13] Because the detrimental effect of the failure to furnish support was in Monterey County, the crime was committed and could be prosecuted there.[14] (*People v. Jones,* at pp. 237–238.)

*People v. Lazarevich* (2004) 124 Cal.App.4th 140 [21 Cal.Rptr.3d 1] (*Lazarevich*), employed a similar analysis. The defendant in that case was tried and convicted of maliciously depriving the mother of her custodial rights regarding the couple's child in violation of section 278.5 and a court order by taking them out of the country and secreting them in Serbia. The Court of Appeal found jurisdiction. The court noted that at the time the defendant's offenses took place former section 279, subdivision (e), provided that " '[p]ursuant to Sections 27 and 778, violation of Section . . . 278.5 is punishable in California, whether the intent to commit the offense is formed within or without of the state, if . . . *a person granted access to the minor child by a court order*[] *is a resident. . . .*' " (*Lazarevich,* at p. 149.)[15] The

---

[13] It is strange that *People v. Jones, supra,* 257 Cal.App.2d 235, and also the opinion of the Attorney General it cites (23 Ops.Cal.Atty.Gen. 210 (1954)), which also relied upon section 778, did not instead rely upon section 777a, which specifically applies to failure to provide cases. Enacted in 1951, section 777a states: "If a parent violates the provisions of Section 270 of this code, the jurisdiction of such offense is in any competent court of either the jurisdictional territory in which the minor child is cared for or in which such parent is apprehended."

[14] The differentiation of crimes of omission and commission for jurisdictional purposes, and the theory that proper jurisdiction of a crime that consists of the omission of an act or failure to comply with a legal duty lies in the place where the legal duty is required to be performed, has been adopted by many state courts. (See, e.g., *Vasquez, petitioner, supra,* 705 N.E.2d at pp. 611–612; *State v. Gantt* (1996) 201 Wis.2d 206, 211 [548 N.W.2d 134, 136]; *State v. Doyen* (S.Ct. 1996) 165 Vt. 43 [676 A.2d 345, 347]; *State v. Kane* (R.I. 1993) 625 A.2d 1361, 1363; *State v. McGill* (1992) 115 Or.App. 122, 125 [836 P.2d 1371, 1372]; *State v. Klein* (1971) 4 Wn.App. 736, 738–740 [484 P.2d 455, 456–458]; *State v. Carr* (1966) 107 N.H. 477, 478 [225 A.2d 178, 179]; *Commonwealth v. Booth* (1929) 266 Mass. 80, 84 [165 N.E. 29, 31]; *State v. Beam* (1921) 181 N.C. 597, 598 [107 S.E. 429, 430].)

[15] As material, current section 279 provides that a violation of section 278.5 "by a person who was not a resident of, or present in, this state at the time of the alleged offense is punishable in this state, whether the intent to commit the offense is formed within or outside of this state, if any of the following apply: [¶] . . . [¶] (c) A lawful custodian or a person with a right to visitation is a resident of this state at the time the child was taken, enticed away, kept, withheld, or concealed." The present version of former section 279, subdivision (e), now set forth in section 279, subdivision (c), makes no reference to sections 27 and 778. (See also

court felt that the purpose of former section 279, which, as indicated, then referred specifically to sections 27 and 778, "was to establish a broad jurisdictional basis for the prosecution in California of offenses involving the interests of persons in California" so that "the reach of California's criminal jurisdiction under former sections 279 and 278.5 is not limited by strict territorial considerations." (*Lazarevich*, at p. 149.) The court reasoned that the objective territorial theory of subject matter jurisdiction[16] permits a court to retain jurisdiction over extraterritorial custodial violations " 'because "to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity . . . ." ' " (*Id.* at p. 150, quoting *State v. Kane, supra*, 625 A.2d at pp. 1363–1364, which in turn quoted *United States v. Bowman* (1922) 260 U.S. 94, 98 [67 L.Ed. 149, 43 S.Ct. 39].) Accordingly, "the period that defendant withheld his children from their mother in violation of the California court order . . . constituted a prosecutable offense *in California*." (*Lazarevich*, at p. 150.) The *Lazarevich* court concluded that "California has jurisdiction of defendant's act of withholding his children in Serbia because his failure to abide by a valid California child custody order constitutes an act or omission outside of the country that necessarily produced *a substantial detrimental effect in California*, and defendant obviously knew that his withholding his children from his former wife produced territorial effects in California." (*Id.* at p. 151, italics added.)

■ The "the objective territorial principle" or "detrimental effects" theory of extraterritorial criminal jurisdiction, which evolved out of the common law view of territorial jurisdiction (LaFave, Substantive Criminal Law, *supra*, §§ 4.2(d), 4.4(a)), was most authoritatively articulated by Justice Holmes in *Strassheim v. Daily, supra*, 221 U.S. 280. The defendant in that case, Daily, who resided in Illinois, offered to bribe Armstrong, the warden of a state prison in Michigan, if he agreed to accept machinery required by contract to be new but which Armstrong knew was used. Daily offered the bribe while he was in Illinois, though he made several visits to Michigan in pursuit of the contract. Assuming that, other than those visits, Daily did no act in Michigan connected with his plan, Justice Holmes concluded that "[i]f a jury should believe the evidence and find that Daily did the acts that led Armstrong to betray his trust, deceived the Board of Control, and induced by fraud the

§ 784.5, subd. (a), which provides that jurisdiction of a criminal action for violation of § 277, 278, or 278.5 (all of which relate to child abduction) shall be in "[a]ny jurisdictional territory in which the victimized person resides, or where the agency deprived of custody is located, at the time of the taking or deprivation.")

[16] Unlike the "subjective territorial principle," which relates to situations in which all of the elements of the crime occurred in the territory of the forum state, the "objective territorial principle" comes into play when the elements of the crime all took place elsewhere. (See LaFave, Substantive Criminal Law (2d ed. 2003) § 4.2(d); Podgor, *International Computer Fraud: A Paradigm for Limiting National Jurisdiction* (2002) 35 U.C. Davis L.Rev. 267, 289.)

payment by the State, the usage of the civilized world would warrant Michigan in punishing him, *although he never had set foot in the State until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.*" (*Id.* at pp. 284–285, italics added; accord, *Ford v. United States* (1927) 273 U.S. 593, 620–621 [71 L.Ed. 793, 47 S.Ct. 531, Treas.Dec. 42121]; *Lamar v. United States* (1916) 240 U.S. 60, 64–66 [60 L.Ed. 526, 36 S.Ct. 255].)

Though Justice Holmes's opinion acknowledged the several visits Daily made to Michigan, the italicized language, which requires no act in the forum state, has been treated by modern courts as a reasonable and sufficient basis upon which to confer territorial jurisdiction, even without the benefit of a jurisdictional statute. (See, e.g., *Travelers Health Ass'n v. Com.* (1949) 188 Va. 877, 892 [51 S.E.2d 263, 269], affd. 339 U.S. 643 [94 L.Ed. 1154, 70 S.Ct. 927] (1950) [" 'a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events' "].) Some courts have heavily emphasized the requirement that the defendant be shown to have intended that the detrimental effect would occur in the forum state (see, e.g., *People v. Blume* (1993) 443 Mich. 476, 480 [505 N.W.2d 843, 845–846]; *Trindle v. State* (1992) 326 Md. 25, 31–32 [602 A.2d 1232, 1235–1236], overruled on other grounds in *Surland v. State* (2006) 392 Md. 17, 29–31 [895 A.2d 1034, 1044–1045]; *Commonwealth v. Bighum, Appellant* (1973) 452 Pa. 554, 558 [307 A.2d 255, 258]), or that he "could . . . reasonably foresee that his act would cause, aid or abet in the commission of a crime within that state" (*State v. Palermo.* (1978) 224 Kan. 275, 277 [579 P.2d 718, 720]), but others appear to deem it sufficient to confer jurisdiction that the extraterritorial act had an "adverse result" in the forum state (*Rios v. State, supra*, 733 P.2d 242, 250).

The detrimental effect theory of extraterritorial jurisdiction has been described as a "doctrine of constructive presence," a legal fiction considered "necessary to the practical administration of criminal justice." (*State v. Winckler* (S.D. 1977) 260 N.W.2d 356, 360; see also *Simpson v. The State* (1893) 92 Ga. 41 [17 S.E. 984].) Under this common law rule, "if a man in the state of South Carolina criminally fires a ball into the state of Georgia, the law regards him as accompanying the ball, and as being represented by it, up to the point where it strikes." (*Simpson v. The State*, at p. 985; accord, *Travelers Health Ass'n v. Com., supra*, 188 Va. 877, 891–892.)

The detrimental effect theory of extraterritorial jurisdiction has been incorporated into the Model Penal Code (§ 1.03, subd. (1)(a)) and has been accepted by our Supreme Court as a valid basis upon which territorial jurisdiction may be posited. (*People v. Betts, supra,* 34 Cal.4th 1039, 1046–1047.) Section 778 essentially codifies this theory of extraterritorial criminal jurisdiction. The statute renders a person liable to punishment for the commission of a public offense "commenced without the State" if the offense is "consummated within its boundaries" through the intervention of an agent or "other means proceeding directly from said defendant." (§ 778.) As discussed above, the text of the statute does not require that the agent or "other means" by which the crime is committed be within the forum state. Where the intervention of the agent or other means "proceed[] directly from [the] defendant," the defendant is deemed constructively present within the "jurisdictional territory" of this state; the doctrine of constructive presence implicit in section 778 satisfies the requirement of section 27, enacted at the same time as section 778, that the crime be committed "in whole or in part . . . within this state."

In short, it is not necessary to the "detrimental effect" theory of extraterritorial jurisdiction that the defendant be physically present in this state during some portion of the time during which his alleged criminal act took place (though that was the case in *People v. Betts, supra,* 34 Cal.4th 1039), or that he act through an agent physically present in this state (as in *Ex Parte Hedley, supra,* 31 Cal. 108), or that there exist a statute or judicially declared exception extending the state's territorial jurisdiction for the particular crime with which the defendant is charged (as in *Lazarevich, supra,* 124 Cal.App.4th 140). Accordingly, in the circumstances of this case, jurisdiction is not precluded by petitioner's physical absence from the state and the fact he did not act through an agent located in California.

*People v. Gerchberg* (1982) 131 Cal.App.3d 618 [181 Cal.Rptr. 505], which petitioner relies upon most heavily,[17] is the only modern California case of which we are aware, involving circumstances somewhat similar to

---

[17] The only other case relevant to the meaning of section 778 that petitioner relies upon is *People v. MacDonald* (1938) 24 Cal.App.2d 702 [76 P.2d 121]. The defendant in *MacDonald,* who married his daughter and was living with her in this state, was prosecuted for incest, which can be committed either by marriage between those of prohibited degrees of blood relationship or by intercourse. One of the counts relied upon the defendant's marriage to his daughter, which was in Arizona; others relied upon acts of intercourse in Riverside County, where the couple resided. Based on section 778a (which unlike § 778 relates only to offenses commenced within but consummated without California), the court reversed the portion of the judgment under the count of incest based on the Arizona marriage—on the ground that the defendant "did not commit any element of that offense or do any overt act in connection therewith in California" (24 Cal.App.2d at p. 711)—but affirmed the portions of the judgment on the counts charging incest by means of intercourse. Because *MacDonald* is factually inapposite and makes no mention of section 778, we do not find it useful.

those here, that cannot be reconciled with the detrimental effect theory of extraterritorial jurisdiction. The defendant in that case was convicted of concealing a child from his legal custodian in violation of a custody decree or after the expiration of a visitation period. While in New York, the defendant had asked his former wife, who then lived with their children in California, to send their children to him. The brief opinion in *Gerchberg* states that "California cannot punish for conduct taking place outside of California unless the defendant has, within this state, committed acts which amount to at least an attempt to commit a crime punishable under California law. That doctrine was laid down by the Supreme Court in *People* v. *Buffum* (1953) 40 Cal.2d [709] [256 P.2d 317]. Although that doctrine has been criticized by legal writers, the Supreme Court continues to adhere to it. (See, for example, *People* v. *Utter* (1972) 24 Cal.App.3d 535, 549–550 [101 Cal.Rptr. 214], in which the doctrine was applied by this court in a homicide case and hearing was denied by the Supreme Court in spite of a vigorous criticism of *Buffum* in our opinion.)" (*People v. Gerchberg*, at p. 620.)

*Gerchberg*'s jurisdictional analysis—repeatedly rejected by courts in other states (see, e.g., *Trindle v. State, supra*, 602 A.2d at p. 1240; *Rios v. State, supra*, 733 P.2d at p. 249; *People v. Caruso* (1987) 119 Ill.2d 376, 388 [116 Ill.Dec. 548, 519 N.E.2d 440, 445,]; *Wheat v. State* (Alaska Ct.App. 1987) 734 P.2d 1007, 1011)—is no longer authoritative in California.[18] *People v. Buffum, supra*, 40 Cal.2d 709, which *Gerchberg* followed, held that, although sections 27 and 778a[19] appear to confer jurisdiction over a conspiracy arising within this state to commit an offense that ultimately is committed in another jurisdiction, those statutes actually do not confer such jurisdiction unless the acts committed within this state in furtherance of the conspiracy amount to an attempt to commit the underlying offense. (*People v. Buffum*, at pp. 717–718.)

---

[18] *Gerchberg*'s specific holding was effectively nullified by the Legislature's adoption in 1983 of legislation stating that, "pursuant to sections 27 and 778," violation of section 278.5 and related statutes is "punishable in California, whether the intent to commit the offense is formed within or without the state, if the child was a resident of California or present in California at the time of the taking, or if the child is thereafter found in California." (Former § 278, Stats. 1983, ch. 990, §§ 3, 4, p. 3521; see § 279.)

[19] Section 778a provides: "(a) Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state. [¶] (b) Whenever a person who, within this state, kidnaps another person within the meaning of Sections 207 and 209, and thereafter carries the person into another state or country and commits any crime of violence or theft against that person in the other state or country, the person is punishable for that crime of violence or theft in this state in the same manner as if the crime had been committed within this state."

Due to the broadness of the language in *Buffum*, the opinion seemingly applied the attempt requirement not only to conspiracy charges but to many other criminal offenses.[20]

*Buffum* was overruled by *Morante, supra*, 20 Cal.4th 403, 415: Acknowledging the considerable criticism *Buffum* had received, *Morante* reexamined the issue and concluded that the *Buffum* rule "is inconsistent with the principles that define the crime of conspiracy and the rationale for punishing the commission of that offense, does not conform to the legislative intent expressed in sections 27, subdivision (a)(1), and 778a, subdivision (a), regarding the scope of California's jurisdiction, is not mandated by other doctrines or provisions constraining state jurisdiction over criminal conduct that may involve more than one jurisdiction, and does not accommodate considerations of public policy that have assumed greater importance in recent years." (*Morante*, at p. 422.) The *Morante* court concluded that California courts have jurisdiction over the criminal prosecution of a defendant for conspiracy where the defendant both entered into an agreement to commit the offense and committed acts in furtherance of the conspiracy in California, but the offense that is the object of the conspiracy was committed in another state.[21] *Morante* thus implicitly overruled *Gerchberg*, which it cited as among the intermediate appellate opinions that had relied upon *Buffum* (*Morante*, at p. 421, fn. 10).[22]

■ The charged offense, violation of section 2052 of the Business and Professions Code, prohibits the act of holding oneself out "as practicing . . . any system or mode of treating the sick or afflicted in this state," or practicing

---

[20] Despite the subsequent opinions in *People v. Burt* (1955) 45 Cal.2d 311 [288 P.2d 503], overruled on other grounds in *People v. Morante* (1999) 20 Cal.4th 403, 424–425 [84 Cal.Rptr.2d 665, 975 P.2d 1071] (*Morante*), and *People v. Anderson, supra*, 55 Cal.2d 655, which distinguished the crimes of solicitation and grand theft and attempted grand theft from that of conspiracy, the Courts of Appeal continued to restrictively limit extraterritorial jurisdiction on the basis of *Buffum*, as in *Gerchberg*. (See cases cited in *Morante*, at pp. 421, fn. 10, 438.)

[21] *Morante, supra*, 20 Cal.4th 403, does not bear directly upon the meaning of section 778. As we have said, unlike section 778, which relates to offenses commenced without but consummated within the state, section 778a, the statute at issue in *Morante* deals with offenses commenced within this state but consummated elsewhere. (See *People v. Brown, supra*, 91 Cal.App.4th 256 [jurisdiction proper under § 778a in a case involving the unlawful practice of medicine because offense commenced within California although completed elsewhere].)

[22] In passing, *Lazarevich, supra*, 124 Cal.App.4th 140, cites sections 27 and 778 for the proposition that "[g]enerally, a person cannot be punished in California for crimes committed outside California *unless he or she has committed acts in California amounting to an attempt to commit the crime*." (*Lazarevich*, at p. 149, italics added.) This statement, which was not essential to the analysis in *Lazarevich*, reflected the holding of *People v. Buffum, supra*, 40 Cal.2d 709. Accordingly, the quoted statement is no longer tenable. To the extent *Lazarevich* suggests that section 778 does not confer jurisdiction unless the defendant "has committed acts in California amounting to an attempt to commit the crime," we believe the opinion misstates the law and decline to follow it.

such a system or mode of treatment by "diagnos[ing], treat[ing], operat[ing] for, or prescrib[ing] for any . . . . physical or mental condition of any person," without having at the time of doing so a valid license. The criminalization of these acts represents a reasonable exercise of the state police power, as the statute was designed to prevent the provision of medical treatment to residents of the state by persons who are inadequately trained or otherwise incompetent to provide such treatment, and who have not subjected themselves to the regulatory regime established by the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.). Causing or intending an injury is not an element of the offense; and the injury sought to be prevented could not occur in another jurisdiction.[23]　■　A preponderance of the evidence shows that, without having at the time a valid California medical license, petitioner prescribed fluoxetine for a person he knew to be a California resident, knowing that act would cause the prescribed medication to be sent to that person at the California address he provided. If the necessary facts can be proved at trial beyond a reasonable doubt, the People will have satisfactorily shown a violation of Business and Professions Code section 2052. It is enough for our purposes that a preponderance of the evidence now shows that petitioner intended to produce or could reasonably foresee that his act would produce, and he did produce, the detrimental effect section 2052 was designed to prevent.

Petitioner endeavors to diminish the significance of the nature and intentionality of his act by focusing almost entirely on the requirement of section 778 that the act be "consummated" within the boundaries of this state. According to petitioner, no criminal act can be "consummated" in California unless the actor or his agent is present here at some point between the commencement of the criminal act and its completion, and that is not here the case. Petitioner may be right with respect to some criminal acts, but his theory does not apply to all, because not all crimes are necessarily "consummated" upon completion by the actor of the last element of the offense. Petitioner's theory is identical to that of the defendant in *Wheat v. State, supra,* 734 P.2d 1007, who was charged with the crime of "custodial interference." In language virtually identical to that of section 778, the criminal jurisdictional statute at issue in *Wheat* permitted the assertion of jurisdiction over an offense commenced outside the state only where commission of the offense is *"consummated"* within the state. Like the defendant in *Wheat,* petitioner equates the word "consummate" with the commission of a criminal act; that

---

[23] The Model Penal Code provides that there is no jurisdiction "when either causing a specified result or a purpose to cause or danger of causing such a result is an element of an offense and the result occurs or is designed or likely to occur only in another jurisdiction where the conduct charged would not constitute an offense, unless a legislative purpose plainly appears to declare the conduct criminal regardless of the place of the result." (Model Pen. Code, § 1.03, subd. (2); see also *State v. Luv Pharmacy, Inc., supra,* 388 A.2d at pp. 195–197, applying a state jurisdictional statute based on this provision.)

is, with an element of the requisite actus reus of the offense. Like the *Wheat* court, we reject the argument. "[T]he word 'consummate' requires a broader reading. In its common meaning, consummation denotes completion. In many instances, of course, a crime is completed upon commission of the last element of the required *actus reus*. Where, however, a statute, in addition to prohibiting conduct, includes within its definition of the offense a specific result, then the crime is not completed until that result occurs. And if the prohibited result occurs in a place other than the conduct which occasioned it, the location of the result may fairly be deemed the place where the crime is 'consummated.' " (734 P.2d at p. 1009.)

As we have said, the acts forbidden by Business and Professions Code section 2052 (the actus reus) are (1) holding oneself out as practicing "any system or mode of treating the sick or afflicted in this state," and (2) actually treating the sick and afflicted in this state, as by, among other things, "prescribing" medication for such persons. A preponderance of the evidence shows petitioner prescribed medication for a resident of this state, aware of the virtual certainty his conduct would cause the prescribed medication to be sent to that person at his residence in California. This state is thus the place where the crime is "consummated." The fact that other parts of the crime were committed elsewhere is immaterial, as there is no constitutional or other reason "that prevents a state from punishing, as an offense against the penal laws of such state, a crime when only a portion of the acts constituting the crime are committed within the state." (*People v. Botkin* (1908) 9 Cal.App. 244, 251 [98 P. 861].) Accordingly, respondent court possesses the necessary jurisdiction.

 Jurisdiction is not defeated by the fact that petitioner consummated the charged offense through the use of intermediaries located in other states. The trial court indicated its belief that a person in Colorado commits a crime in California if he sends a bomb through the mail, which explodes when the addressee opens the package in California. Petitioner's counsel agreed that might be true, but distinguished the situation here because it was not petitioner, but the Mississippi pharmacy, that sent the prescription to California, and petitioner "had no contact at all with Mr. McKay." The mere fact that petitioner acted through intermediaries—whether they be deemed "agent[s] or any other means"—is irrelevant under section 778: All that is required by the statute is that the intervention of such intermediaries "proceed[] directly from" petitioner, as a preponderance of the evidence shows it did. Petitioner's contention that he cannot be deemed to have committed any part of the offense in California because "the filling of the prescription, which occurred in Mississippi, was an entirely separate act, requiring a separate license," for

which he cannot be held criminally accountable, is also unsustainable. That argument, which implies the pharmacy was a "guilty agent," is also undermined by section 778. By making the innocence or guilt of the agent irrelevant, the statute abrogates the common law rule that "[o]ne who, at all times outside the state, commits a crime within the state by a 'guilty agent' is not subject to the jurisdiction of the state." (LaFave, Substantive Criminal Law, *supra*, § 4.4(a) at p. 298.)

█ Nor is jurisdiction to criminally prosecute petitioner defeated by the availability to the state of a civil remedy. Section 2242.1 of the Business and Professions Code states that, with specified exceptions, "[n]o person or entity may prescribe . . . dangerous drugs . . . on the Internet for delivery to any person in this state, without an appropriate prior examination and medical indication . . . ." (Bus. & Prof. Code, § 2242.1, subd. (a).) Residents of California who violate this provision are subject to either a fine of up to $25,000 per occurrence pursuant to a citation issued by the Board or a civil penalty up to the same amount per occurrence in an enforcement action commenced by the Attorney General. (*Id.,* subds. (b), (c).) If the person or entity that violates the statute is not a resident of this state, the violation shall "be reported to the person's or entity's appropriate professional licensing authority." (*Id.,* subd. (e).) Petitioner maintains that section 2242.1 reflects a legislative acknowledgment that sections 27 and 778 "are not broad enough to reach the conduct in question," and the civil remedies it prescribes are therefore exclusive remedies. There is no reason to think the Legislature shared this view. Section 2052, which applies to the practice of medicine generally, specifically declares that "[t]he remedy provided in this section shall not preclude any other remedy provided by law" (Bus. & Prof. Code, § 2052, subd. (c)), and it is settled that a state " 'may impose both a criminal and a civil sanction in respect to the same act or omission.' " (*One Lot Emerald Cut Stones v. United States* (1972) 409 U.S. 232, 235 [34 L.Ed.2d 438, 93 S.Ct. 489].)

For the foregoing reasons, and because a preponderance of the evidence now shows that petitioner's acts outside this state were intended to produce and produced detrimental effects within it, we believe the objective territorial principle codified by section 778 provides a basis upon which jurisdiction might be found to lie in this case. Indeed, if petitioner's communications had been by letter or telephone facsimile, there is little doubt jurisdiction would lie. (See *Benson v. Henkel* (1905) 198 U.S. 1, 15 [49 L.Ed. 919, 25 S.Ct. 569] ["where an offense is begun by the mailing of a letter in one District and completed by the receipt of a letter in another District, the offender may be punished in the latter District"], accord, *In re Palliser* (1890) 136 U.S. 257, 266 [34 L.Ed. 514, 10 S.Ct. 1034]; *United States v. Steinberg* (2d Cir. 1932) 62 F.2d 77, 78, cert. den. (1933) 289 U.S. 729 [77 L.Ed. 1478, 53 S.Ct. 526], and *Lamar v. United States, supra,* 240 U.S. 60, 65–66 ["[t]he [unlawful]

personation was by telephone to a person in New York . . . and it might be found that the speaker also was [there]; but if not, at all events the personation took effect there"].)

The remaining question is whether it should make a difference that petitioner's offense took place in cyberspace rather than in the real space for which the jurisdictional statutes were designed.

## III.

### It Is Jurisdictionally Immaterial That Petitioner Committed the Charged Offense in Cyberspace

"Cybercrime" relates not just to the unauthorized use or disruption of computer files or programs and the theft of an electronic identity, but also to the use of a computer to facilitate or carry out a traditional criminal offense, as alleged in this case. (Katyal, *Criminal Law in Cyberspace* (2001) 149 U.Pa. L.Rev. 1003, 1013–1014; Charney & Alexander, *Computer Crime* (1996) 45 Emory L.J. 931, 934.) This species of cybercrime is considered by some no different from crimes committed in real space, and this school feels it should therefore be regulated in the same manner. (See, e.g., Kelly, *The Cyberspace Separatism Fallacy* (1999) 34 Tex. Int'l L.J. 413, 414; Goldsmith, *Against Cyberanarchy, supra,* 65 U.Chi. L.Rev. 1199.) However, a growing number believe cyberspace requires a different system of rules (see, e.g., Johnson & Post, *Law and Borders—The Rise of Law in Cyberspace, supra,* 48 Stan. L.Rev. 1367), particularly with respect to jurisdictional issues (see, e.g., Reidenberg, *Technology and Internet Jurisdiction, supra,* 153 U.Pa. L.Rev. 1951; Wilske & Schiller, *International Jurisdiction in Cyberspace: Which States May Regulate the Internet?* (1997) 50 Fed.Comm. L.J. 117). Jurisdictional doctrine, which is constitutionally grounded in the due process clause of the Fourteenth Amendment (*Internat. Shoe Co. v. Washington, supra,* 326 U.S. 310 [90 L.Ed. 95]), is not static. Jurisdictional principles have been adjusted to accommodate evolving social, economic, and political needs (*Hanson v. Denckla, supra,* 357 U.S. at pp. 250–251; *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220, 222–223 [2 L.Ed.2d 223, 78 S.Ct. 199]), and the Supreme Court has long also "recognized that personal jurisdiction must adapt to progress in technology" (*Weber v. Jolly Hotels* (D.N.J. 1997) 977 F.Supp. 327, 333). Mindful of the dynamic relationship between law and technology, some maintain that "[t]he modern development of the Internet represents just the type of technological change that calls for the doctrinal modification traditionally characterizing both the common law process of constitutional interpretation in general and the law of personal jurisdiction in particular." (Redish, *Of New Wine and Old Bottles: Personal Jurisdiction, the Internet, and the Nature of*

*Constitutional Evolution, supra,* 38 Jurimetrics J. 575, 576, 577; see also Note, *Regulation of the Internet: The Application of Established Constitutional Law to Dangerous Electronic Communication* (1996–1997) 85 Ky. L.J. 997.)

An aspect of Internet technology that assertedly most warrants modification of jurisdictional doctrine is the extent to which it undermines the role of territorial boundaries in delineating "law space"—that is, in providing notice that the crossing of a physical boundary may subject one to new rules. It is said that "[c]yberspace radically undermines the relationship between legally significant (online) phenomena and physical location. The rise of the global computer network is destroying the link between geographical location and: (1) the power of local governments to assert control over online behavior; (2) the effects of online behavior on individuals or things; (3) the legitimacy of a local sovereign's efforts to regulate global phenomena; and (4) the ability of physical location to give notice of which sets of rules apply. The Net thus radically subverts the system of rule-making based on borders between physical spaces, at least with respect to the claim that Cyberspace should naturally be governed by territorially defined rules." (Johnson & Post, *Law and Borders—the Rise of Law in Cyberspace, supra,* 48 Stan. L.Rev. at p. 1370.) For these reasons, it is claimed that governmental efforts "to map local regulation and physical boundaries into Cyberspace" (*id.* at p. 1372) are sure to prove quixotic and the Internet must be therefore left alone to "develop its own effective legal institutions" (*id.* at p. 1387).

▮ While Internet technology can create new realities courts may be compelled to accommodate,[24] those who claim their Internet-related conduct should be exempt from a traditional legal principle because the conduct is not within the paradigm for which the rule was designed bear the burden of establishing the fact. Petitioner has not done so.

---

[24] See, e.g., *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844 [138 L.Ed.2d 874, 117 S.Ct. 2329], invalidating most provisions of the Communications Decency Act of 1996 (Pub.L. No. 104-104 (Feb. 8, 1996) 110 Stat. 133) due in part to the imperfections of Internet filtering technology, and *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 333, declining to impose distributor liability for third party defamation on Internet service providers because it "would create an impossible burden in the Internet context." But see *Yahoo! v. La Ligue Contre Le Racisme* (9th Cir. 2006) 433 F.3d 1199, 1216, rejecting the argument that a foreign judgment against an Internet service provider should not be enforced in the United States on the ground that compliance was technologically impossible. It has also been pointed out that the imposition and enforcement of legal duties can have the effect of stimulating the development of conforming technologies, as in the case of the Digital Millenium Copyright Act (17 U.S.C. § 1201(a)(2)), which prohibits the sale and manufacture of devices that circumvent technological protections on digital works, and the Communications Assistance for Law Enforcement Act (47 U.S.C. § 1002(a)(1)), which requires a "wiretap-ready capability for new digital telecommunications infrastructure." (Reidenberg, *Technology and Internet Jurisdiction, supra,* 153 U.Pa. L.Rev. at p. 1972.)

Petitioner does not make the bold claim that cyberspace is or should be beyond the reach of the criminal law, but he does insist that the People's assertion of extraterritorial jurisdiction over his Internet conduct is unreasonable because (1) he and others are not on notice of the unlawfulness of such conduct, and (2) the assertion of jurisdiction would not deter others from his allegedly unlawful conduct, but (3) it would deter physicians licensed in other states from providing residents of this state many useful forms of medical assistance over the Internet.

The claim that petitioner and others like him who prescribe medications over the Internet lack notice of the unlawfulness of that conduct is unacceptable. California's proscription of the unlicensed practice of medicine is neither an obscure nor an unusual state prohibition of which ignorance can reasonably be claimed, and certainly not by persons like petitioner who are licensed health care providers. Nor can such persons reasonably claim ignorance of the fact that authorization of a prescription pharmaceutical constitutes the practice of medicine.

The claim that a finding of jurisdiction in this case would not deter out-of-state physicians from prescribing medications for residents of this state via the Internet cannot be so easily dismissed.[25] Such physicians or the Web sites that employ them can and usually do conceal their names, locations, and state of licensure (Bloom & Iannacone, *Internet Availability of Prescription Pharmaceuticals to the Public* (1999) 131 Annals of Internal Med. 830), and it is difficult and costly for regulatory and law enforcement agencies to discover this information, as they must in order to charge a person with the unlawful practice of medicine.

Nonetheless, as this case demonstrates, the information can sometimes be discovered, so that federal and state agencies are not invariably unable to find and assert jurisdiction to punish persons and entities engaged in the unlawful prescription of pharmaceuticals over the Internet. (See, e.g., *United States v. Yates* (11th Cir. 2006) 438 F.3d 1307; *Siddall v. Tenn. Bd. of Med. Examiners* (June 27, 2006, No. M2004-02767-COA-R3-CV) 2006 Tenn.App. Lexis 437; *Jones v. State Bd. of Medical Examiners* (2005) 691 N.W.2d 251; *Ross v. State Med. Bd. of Ohio* (2004) 2004 Ohio 2130; *State ex rel. Stovall v. DVM Enterprises, Inc.* (2003) 275 Kan. 243 [62 P.3d 653]; *State ex rel. Stovall v.*

---

[25] With respect to this issue, it is appropriate to distinguish the facts of this case from the common situation in which, while in another state, a California citizen receives medical treatment from a physician, licensed there but not in California, who writes her a prescription knowing she is a California resident intending to return to this state. Nothing in this opinion is intended to address that situation.

*ConfiMed.com* (2002) 272 Kan. 1313 [38 P.3d 707]; see also Drugstores on the Net: The Benefits and Risks of On-Line Pharmacies, Hearings before the Subcom. on Oversight & Investigations of the Com. on Commerce, H.R.Rep. No. 106-51, 1st Sess., pp. 18–23, 44–51, 185–195 (1999) [statements of Kansas Attorney General and representatives of the Federal Trade Commission].) In an amicus curiae brief in behalf of himself and the Board, the Attorney General represents that the Board is actively engaged in investigating the significant number of complaints it receives about the unlawful prescription of drugs by means of the Internet for residents of this state by physicians not licensed here, and has had "some success" in constraining this practice. The Attorney General is himself not now willing to accept the view that unlawful Internet activity can only be addressed at the national or international level,[26] and we have no basis upon which to say he is wrong.

Given the absence at this time of any significant national or international effort to deter the widespread and growing use of the Internet to sell drugs without a prescription made on the basis of a good faith hands-on medical examination by a physician licensed in the state in which the patient resides (or without any prescription at all), the denial of state jurisdiction to punish the practice would provide the unscrupulous physicians who engage in it even greater freedom to do so than they already possess. Moreover, while state efforts to identify and obtain personal jurisdiction over such physicians are now often frustrated by Internet technology, technological innovations, network engineering, and Internet intermediaries are making it easier to identify and locate those whose unlawful acts take place in cyberspace and to enforce the law. (Reidenberg, *States and Internet Enforcement* (2003) 1 U. Ottawa L. & Tech. J. 213.) Web sites and Internet service providers already possess the ability to design or filter content based on user location (see, e.g., *Yahoo! v. La Ligue Contre le Racisme, supra*, 433 F.3d 1199, 1203 [describing the report to a French court of experts on geographic filtration]), and at least one state court has issued an enforceable order directing a provider of prescription pharmaceuticals to cease delivering unlawfully prescribed drugs into the forum state, and to place notice on its Web site that it will not do so. (*State ex rel. Stovall v. DVM Enterprises, Inc., supra*, 62 P.3d at pp. 655–656.)[27] The prospect of other technological developments counsels

---

[26] Compare, e.g., Opinion of the Florida Attorney General, No. 95-70 (Oct. 18, 1995), 1995 WL 698073; see also Comment, *Regulating Speech Across Borders: Technology vs. Values*, 9 Mich. Telecomm. & Tech. L.Rev. 395, 448 (Internet requires "international arrangements that transcend state borders and originate beyond independent state governmental processes").

[27] The order states that the defendants are permanently enjoined from " 'prescribing, dispensing, or delivering any prescription-only drug to a person located within the State of Kansas unless licensed to practice medicine and surgery by the State Board of Healing Arts,' "

judicial caution in accepting technology-based arguments against the assertion of jurisdiction, as that would eliminate incentives for technology developers to innovate in ways that would facilitate law enforcement and support public values.

Finally, there appears to be little danger that the finding of extraterritorial jurisdiction in this case will stifle provision over the Internet of many useful forms of medical assistance to residents of this state in need thereof. The practice of "telemedicine"—i.e., "health care delivery, diagnosis, consultation, treatment, transfer of medical data, and education using interactive audio, video, or data communications"—is specifically authorized by the Telemedicine Development Act of 1996 (Bus. & Prof. Code, § 2290.5, subd. (a)(1)). Furthermore, the Medical Practice Act exempts from the unlawful practice of medicine "a[] practitioner located outside this state, when in actual consultation, whether within this state or across state lines, with a licensed practitioner of this state" provided only that the out-of-state practitioner does not "appoint a place to meet patients [in this state], receive calls from patients within the limits of this state, give orders, or have ultimate authority over the care or primary diagnosis of a patient who is located within this state." (Bus. & Prof. Code, § 2060.)[28]

In short, there is no persuasive reason why petitioner's or his employer's use of cyberspace, or the use of it by McKay or the Web site he contacted, should defeat application in this case of the traditional legal principles we rely upon to find extraterritorial jurisdiction.

and further ordering " 'that these Defendants must post on all written and Internet advertisements a notice that these Defendants will not deliver a prescription-only drug into the State of Kansas, and that this notice will remain on all written and Internet advertisements until such time as these Defendants are authorized to deliver prescription-only drugs into the State of Kansas.' " (*State ex rel. Stovall v. DVM Enterprises, Inc., supra,* 62 P.3d at pp. 655–656.)

[28] Additionally, the Legislature has by statute authorized the Board, "at its discretion, [to] develop a proposed registration program to permit a physician and surgeon, or a doctor of podiatric medicine, located outside this state to register with the board to practice medicine or podiatric medicine in this state across state lines." (Bus. & Prof. Code, § 2052.5, subd. (b).) For purposes of the proposed registration program, "[a] physician and surgeon practices medicine in this state across state lines when that person is located outside of this state but, *through the use of any medium, including an electronic medium,* practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any . . . physical or mental condition of any person in this state." (*Id.,* § 2052.5, subd. (a)(1), italics added.) Further, the Federation of State Medical Boards has promulgated "Model Legislation Regarding Licensure" permitting a physician with a medical license in one state to apply for a special-purpose license to practice across state lines "by electronic or other means" which has been adopted in some states. (See, e.g., Ala. Code § 34-24-500 et seq.; 22 Tex. Admin. Code § 174.1 et seq.; Tenn. Code Ann. § 63-6-231.)

## DISPOSITION

For the foregoing reasons, the petition is denied and the temporary stay is hereby dissolved.

Haerle, J., and Richman, J., concurred.

Petitioner's petition for review by the Supreme Court was denied July 18, 2007, S153961.